## GUTH CHOCOLATE CO. v. GUTH.

(District Court, D. Maryland.   June 2, 1914.)

1. TRADE-MARKS AND TRADE-NAMES (§ 73*)—UNFAIR COMPETITION—RIGHT TO USE OF NAME.

Although a man may have long been engaged in the production and sale of a particular kind of wares which have acquired a widespread and valuable reputation in connection with his name, so that any goods sold under that name will be taken for his, another having the same surname may lawfully use it in the same business and in connection with similar goods, provided he does nothing unnecessarily to increase the difficulty of distinguishing his goods from those of his competitor, but he may be further required to take reasonable precautions to prevent their confusion.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 84; Dec. Dig. § 73.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. TRADE-MARKS AND TRADE-NAMES (§ 33*)—UNFAIR COMPETITION—RIGHT TO USE OF NAME.

A man, whose name has become so identified with his goods as to give it a secondary meaning, may sell the exclusive right to its use in connection with a sale of his business, and such a contract is enforceable, although it will not readily be presumed but must be clearly shown.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. § 33.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 35*)—CONVEYANCE WITH SALE OF BUSINESS.

The exclusive right to a trade-mark can be secured only by affixing it to the goods to be designated or to the packages in which they are sold, and the transfer by a man of the right to use his name as a trade-mark does not preclude him from subsequently using it himself in his own business otherwise than by so affixing it to his goods as a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. § 35.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 35*)—UNFAIR COMPETITION—USE OF NAME.

Complainant, Guth Chocolate Company, was organized by defendant, Guth, to succeed to the business of a similarly named corporation which had failed. Defendant bought from the receivers of the old company its plant, boxes, labels, and good will, and conveyed the same, together with "the use of the name 'Guth,' for the purpose of manufacturing and selling candies under the Guth label." Defendant became the largest stockholder and president of complainant. Both complainant and its predecessor made the name "Guth" the prominent feature in their advertising and on their packages, and by it their products became known to the retail trade throughout the country. Defendant signed many of the advertising circulars and letters with his full name, as president of complainant. He afterward sold his stock, retired from the management of the company, and organized a new company under the name of the Chocolate Products Company. Through circulars he informed the trade of the change, but the packages in which his products were sold to retail customers were marked only "Chocolates by Charles G. Guth," with the statement that none were genuine without such full signature. *Held* that, while defendant did not by his conveyance deprive himself of the right to use his name in the business of the new company, he was not entitled to use the name "Guth" on the packages or labels of its goods either alone or in connection with other words.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. § 35.*]

In Equity. Suit by the Guth Chocolate Company against Charles G. Guth. On final hearing. Decree for complainant.

Emery, Booth, Janney & Varney, of Boston, Mass., and City of New York, Laurence A. Janney, of Boston, Mass., and Marbury, Gosnell & Williams and George Weems Williams, all of Baltimore, Md., for plaintiff.

Richard B. Tippett, E. Walton Brewington, and George W. Lindsay, all of Baltimore, Md., for defendant.

ROSE, District Judge. Plaintiff asks that the defendant be restrained from using the name "Guth" in the sale of candies and from doing in his competition with it certain other things which it says are unfair.

It is a Delaware corporation; the defendant a Maryland citizen. Since he was 14 he has been a maker of candy. Until 1899 he was

employed in various candy factories, presumably in subordinate positions. About that time he started in business for himself in Trenton, N. J. His capital was limited. His venture was on a very small scale. It soon came to grief. He moved to this city. He believes that up to that time chocolate candy had not been manufactured in Baltimore. He says that he succeeded in convincing others that it could be here profitably made. He organized, or helped to organize, the Headley Chocolate Company. It speedily built up a large business which it apparently still retains. After the great fire in Baltimore in February, 1904, he severed his connection with it. With the financial assistance of other persons, he organized a new corporation under the laws of Maryland. From that time on he appears to have done his best to make his surname prominent in the candy trade. He called the new company the "Guth Chocolate Company of Baltimore City." He determined that "Guth" should be the trade-mark of the new business. An expert in such matters was commissioned to prepare an artistic and striking embodiment of that word. A comparison of this design with the ordinary signature of the defendant shows that the former was suggested by the latter. There are many differences in detail. Nevertheless, unmistakably the one was kept steadily before the eye of the designer of the other. He did for a somewhat work-a-day signature what a portrait painter who knows his business usually does for a commonplace countenance. You can see the likeness. Nevertheless, if you are a candid critic, you can point out the respects in which the artist has greatly improved upon the original. The design as made and accepted was used in every way in which the family pride and the advertising instinct of the defendant could find opportunity to employ it. The company made some candies for jobbers who each had his own brand. These of course were labeled as their owners directed. The bulk of the company's products were sold as its own. On every package of them the word "Guth" was imprinted or embossed. On each piece of the more expensive kinds of chocolate made by it the name was impressed, and it was displayed on the little paper cups in which each individual chocolate was packed. It appeared on the company's stationery and in all its advertising literature. The defendant says his idea was to have the public recognize the brand of goods by that name in the characteristic script. The company spent $100,000 in advertising. It built up a large business. It started retail stores in Baltimore and in several other cities. The defendant says that he or it, for he does not instinctively distinguish between the individual and corporate personality, was the first to put out candies to be retailed at $1 a pound. His judgment, he thinks, has found vindication in the fact that there is now a demand for candies selling as high as $1.50. He is not unnaturally proud of his accurate forecast of the possibilities of the market. Some of those who are embarrassed by the high cost of living may not be grateful to him for creating a taste for so expensive a luxury. The circumstance has here significance merely because it shows how generally and favorably the name "Guth" became known to the sellers and consumers of candy. In spite of, or perhaps because of, the rapid extension of its business, it

put a greater strain upon its financial resources than they could bear. A state court receivership followed. For a while it was supposed that its difficulties would be but temporary, and that its creditors would lose little. As time went on it was found that this hope was illusory. The company had much money invested in its plant and machinery. These were installed in a rented building. If they were moved, a large part of their value would be destroyed. It had on hand candy boxes, stationery, etc., which the defendant says cost it $20,000. If it had continued in business they would have been worth that sum to it. All of them, however, bore the name "Guth." They were valueless to any one who did not want to use that word as one of the trade-marks or trade-names of his business. It became obvious that the only possible· purchaser was some one who wished to continue to sell candies as Guth's.

The defendant arranged for the organization of a new company— the complainant. The phrase "of Baltimore City," which the Maryland corporation law, as it then stood, had required to be a part of the corporate title of the old concern, was in ordinary speech omitted. It had been universally known as the Guth Chocolate Company. The new venture was to bear the same title. The first company had been organized under the laws of Maryland. The second was formed under those of Delaware. In March, 1909, plans for the transfer of the business from the old to the new corporation were consummated. The latter was incorporated. The defendant offered the receivers $16,000 in cash and a release of his $4,000 claim for salary for the "factory, machinery, fixtures, and equipment located at 30 South Calvert street, Baltimore, together with all boxes, labels, trade-marks, good will, name of the company, raw material, and manufactured goods on hand." With the approval of the court, the receivers accepted the proposal. The sale was duly ratified on March 25, 1909. At a later hour on the same day the complainant's directors held their first meeting. To them the defendant, acting, as he stated, for himself and his associates, proposed in writing to sell "the factory and all the machinery and equipment contained in the building 30 South Calvert street, Baltimore, Md., together with all labels, boxes, packing material, manufactured goods, and appurtenances necessary and now contained in said factory as per schedule attached hereto, together with the good will and the use of the name 'Guth' for the purpose of manufacturing and selling candies under the Guth label; also the complete formulas for manufacturing the Guth chocolates, bonbons, and fancy candies, together with any improvements or changes that might be made from time to time in said formulas. Said offer to include all the property, rights, and privileges lately acquired from the receivers of the Guth Chocolate Company of Baltimore." All that he bought from the receivers he expressly sold to the plaintiff. His counsel suggest that he sold nothing else. If they are right, he obtained for a salary claim of $4,-000 against the old concern $1,000 in cash and $83,000 of the common stock of the company. The plaintiff gave him in money $17,000, or $1,000 more than his cash payment to the receivers. He gave the

latter nothing else except the release of the salary claim. He received from the plaintiff $83,000 of its stock.

Individuals or groups of individuals often act as mere conductors through which property instantaneously passes from one party to another. Not infrequently they make on paper at least even greater profits than those obtained by the defendant. Such transactions are so common that they usually give occasion for nothing more than a passing comment. They are, however, worthy of that notice. In this case what was done would have deserved that much attention even if the facts were as the defendant's counsel supposed them to have been.

Unquestionably defendant did undertake to sell all that he had bought. His offer was expressly "to include all the property, rights, and privileges" he acquired from the receivers. Quite as clearly he did not attempt to transfer any tangible property other than that which the judicial sale had given him. From the receivers he obtained "the factory, machinery, fixtures, and equipment located at 30 South Calvert street, Baltimore, together with all boxes, labels, * * * raw material, and manufactured goods on hand." He conveyed to the plaintiff "the factory and all of the machinery and equipment contained in the building 30 South Calvert street, Baltimore, Md., together with all labels, boxes, packing material, manufactured goods, and appurtenances necessary and now contained in said factory, as per schedule attached."

The phraseology differs somewhat. The things conveyed are the same. Did he in like manner restrict the intangible rights he assumed to sell to those which he had bought? The receivers gave him the good will of the old business. That, in so many words, he passed over to the plaintiff. They sold him the "trade-marks" and "name of the company." He did not specifically mention these in his assignment to the plaintiff. They passed under the general clause by which he conveyed all that he had obtained from the receivers. The new company was apparently not content to let its rights rest entirely upon more or less vague language. In his proposal to it he offered "the use of the name 'Guth' for the purpose of manufacturing and selling candies under the Guth label." The products of the old company had been sold as Guth candies. Whatever other trade-marks it once had were of minor value, even if any of them were at that time still in use. It was as Guth's that its goods were known in the market. The organizers of the plaintiff might well have questioned whether a conveyance of the trade-marks of the old concern would give them the desired rights in the vitally necessary name.

Had the first company acquired a valid trade-mark in it? Surnames are ordinarily not subject to exclusive appropriation as trade-marks. This had not been used as such for ten years next preceding the enactment of the Trade-Mark Act of 1905 (Act Feb. 20, 1905, c. 592, 33 Stat. 724 [U. S. Comp. St. Supp. 1911, p. 1459]). Even if it had been, the Supreme Court had not then handed down its opinion in Davids Mfg. Co. v. Davids, 233 U. S. 461, 34 Sup. Ct. 648, 58 L. Ed. 1046. In so important a matter there was no reason to take any chances. All

that the receivers had sold to the defendant the new company took. It was dealing, however, with him. In the name "Guth" he might have an individual property. The new company wanted all the rights that the old or the defendant, or both combined, could confer upon it to the "use of the name 'Guth' for the purpose of manufacturing and selling candies under the Guth label." It desired something else. It needed the formulas used in making Guth chocolates, bonbons, and fancy candies. Perhaps the old company owned them; perhaps it did not. There is no evidence on the subject. In the transfer from the receivers nothing had been said about them. In any event, the defendant knew them. It was highly desirable from the plaintiff's standpoint that it should acquire the right to appropriate any improvements which he might subsequently make in them. He undertook to transfer all of such formulas "together with any improvements or changes that might be made from time to time" in them.

It is clear that, while the defendant was a conduit through which much of the property of the old company passed from it to the new, he was something more. He gave to his new creation more than he had received from its predecessor.

Defendant in his answer says that the word "Guth" was used in the candy business by others than either the defendant or the plaintiff and its predecessor. The old company had owned and operated retail stores in Baltimore and in other cities. It organized a subsidiary company under the laws of Illinois. In accordance with the fixed policy of defendant and of the old company, the stores were called by his name. The Illinois corporation was the Guth Incorporated Company. All these concerns sold, under the Guth label, chocolates made by the Maryland corporation. Defendant did not buy either these stores or the stock of the Illinois subsidiary. The receivers sold them to other parties. When the answer was prepared, defendant seems to have thought that the purchasers had acquired the right to use the name "Guth." He has offered no evidence to sustain such contention. The testimony seems to show that none of them asked for or obtained any other right than to continue to call their stores Guth and to use that name on other candies made by them so long as they purchased all their chocolates from the plaintiff. It will be unnecessary to take further notice of this defense.

The defendant was the first president of the plaintiff. He held that office until the 28th of July, 1913. During that period of some four years and four months its business was actively pushed. He took personal charge of the preparation and circulation of its advertising literature. He wrote most, if not all, of it. What was not of his own composition received his approval before it was issued. He identified himself with the company, or it would be more accurate to say he identified the company with himself. Thus, at the plaintiff's expense, there was issued at more or less regular intervals a sheet called the "Guth Chocolate Man." It stated that it was published by Charles G. Guth, president of the Guth Chocolate Company, Guth Building, Baltimore, Md. In it are to be found such phrases as these:

"Most novel offer *I* ·ever made you."
"*I* spend more time, money and real labor," etc.
"*I* do not offer same old thing."
"This Easter *my* selection," etc..
"The famous House of Guth guarantees each piece."

The first page of the issue for March 1, 1912, is taken up· with

"Easter Greetings.
"To *My* Friends—The Druggists."

In it he tells them:

"But you and *I* have a reputation to maintain and to build. *I* have put into this offer *my* best thought and knowledge of the druggists' candy problems. *I* know them from personal experience and from personal first-hand knowledge of druggists just like you all over this broad land. *I* am proud of every box of candy that bears the name of Guth. *I* am proud of the druggists who sell *my* candy. Druggists who sell Guth candies are steady customers, because they have steady customers. Neither they nor *I* worry about mere price competition."

To this is appended a facsimile of the defendant's full signature "Charles G. Guth" as it now appears on the boxes of candy which plaintiff says infringe upon its rights.

Defendant freely used the facsimile of his signature in the plaintiff's advertisements, which he spread broadcast over the land. From them it seemed that the defendant bore to the plaintiff the same relation which Louis XIV thought he did to France. Defendant is now competing with the plaintiff. The advertising methods used while the former was managing the latter make it hard to keep the buyers of candy from confusing the goods of the one with those of the other.

Apparently plaintiff had at no time, since defendant's connection with it, attempted to sell its products to all or even to many of the retailers of candy in any particular town. It preferred to get one, or at most a very few, establishments in each place to take what it called Guth agencies. The so-called agent bought his candies outright, but, so long as he ordered what seemed to the plaintiff a reasonable quantity, it would not sell to any other storekeeper in his city or town. In most places the purveyors of its candies were druggists. The bulk of its trade was in 80-cent and $1 chocolates; that is, in relatively high-priced candies. The demand for these was in most cases largest among the patrons of the more prominent drug stores. Its effort, therefore, was to get the leading druggists, or one of the leading druggists, in each city or town to handle its goods. In this it appears to have had a fair measure of success.

The plaintiff had both preferred and common stock. The former had no voting powers. There were outstanding 1,000 shares of common stock of the par value of $100 each. Eight hundred and thirty of these were at its organization issued to the defendant in part payment of the property and rights he then transferred to it. He says that at that time he retained only 100 of them for his own use. He subsequently acquired others. By the beginning of 1913, if not before, he held a majority of all the plaintiff's common stock and was in undisputed control of it. At that time the United Drug Company, a Massa-

chusetts corporation, appeared upon the scene. It had sought to sell some of its stock to a prominent druggist in each city and town in the country. If he bought, he was given in that place the exclusive agency for the company's products. Some thousands of druggists scattered all over the land were among its stockholders. It so happened that an appreciable number of these were also agents or customers of the plaintiff. For that or other reasons it early last year sought to obtain all the common stock of the latter. In February, 1913, it made an agreement to buy defendant's. He undertook to procure for it, in addition to his own shares, 44 of those then held by some other persons. About the same time it bought the stock of the only other holder. It became the owner of all the common stock of the plaintiff. In the final form in which the transactions between the defendant and the United Drug Company took, he sold it 553 shares of the plaintiff's common stock held personally by him for $65,000 in cash and the transfer to him of 350 shares of the plaintiff's preferred stock. He turned over to the purchaser 44 shares of plaintiff's common stock which he had obtained from other persons at the price at which he paid for them, viz., $100 per share, or $4,400 in all. At the time both parties doubtless assumed that the plaintiff's preferred stock was worth par. The United Drug Company therefore supposed it was paying the defendant $104,400 for 597 shares of common stock, or at the rate of $174.80 a share. He says that, after severing his connection with the plaintiff, he found it necessary to realize upon its preferred stock, and he was able to obtain only $65 a share for it.

Taking the preferred stock at the time of the transfer to have been worth only what he subsequently obtained for it, the United Drug Company paid for the common stock $154.35 a share. At that time the book value of such stock was $130.19 a share. Forty-nine dollars and sixty-nine cents a share of this was represented by the value at which the trade-marks, formulas, etc., were then carried on the plaintiff's books. The defendant says that the large earnings of the plaintiff, rather than the supposed worth of its property, induced the United Drug Company to pay the price it did. However that may be, the defendant received about twice as much as his proportion of the tangible assets of the plaintiff were worth.

The United Drug Company, though it owns all the common stock of the plaintiff, is not a party to this suit, and perhaps could not become one. It still remains true that, when it was bargaining with the defendant for his stock, he furnished it with a statement of the plaintiff's financial condition. If the price he asked and received tends to show that he then by what he did, if not by what he said, represented the plaintiff to be the owner of something else than its chattels and choses in action, it may be material. It would, however, not be safe to infer much from what was then done.

In the language of Lord Macnaghten in Reddaway v. Banham. Law Reports (1896) Appeal Cases, 7, "cases of this sort must depend upon their particular circumstances. The facts of one case are little or no guide to the determination of another." Not much harm will be done if the trial judge recites facts which may be ultimately held immaterial.

A good deal may be caused by his omission of something which an appellate court might, if brought to its attention, consider significant.

It was not the intention of the parties that by the sale of his stock defendant should sever his connection with the plaintiff. He retained its presidency. He continued by circulars, letters, and other ways to push the sale of its products. The drug stores which were conducted by the stockholders of the United Drug Company were called Rexall Stores. Their proprietors Rexallites. Under date of May 16, 1913, he sent a circular letter to each of the some thousands of such proprietors. To this letter he appended the facsimile of the same signature which he has now adopted as the trade-mark of his new business. The circular is in style like the others from which quotations have been made. In it his personality and that of the company are made almost interchangeable. Relations between him and the representatives of the new owners of the plaintiff's stock soon became somewhat strained. There had been friction even before the purchase was consummated. The agreement between the defendant and the United Drug Company was made in February, 1913. It claimed that it dealt upon the assumption of the accuracy of a statement of the financial condition of the plaintiff then shown it by him. The facts which subsequently came to its knowledge it said showed that in material respects this statement was erroneous. The dispute was adjusted by his abating $40,000 of the price which by the February agreement he was to receive. The consideration paid him was thus reduced to the figures heretofore stated. It is probable that some natural dislike, if not distrust, resulted. This might have been lived down. The defendant had, however, been used to a very free hand in the management of the business. He had acted as he thought best. It was in the nature of things that strangers, who had at a large price acquired all the stock of the company, should expect to be consulted as to what was being done with it. It was equally inevitable that any limitation on the freedom he had heretofore enjoyed should prove irksome to him. On July 28, 1913, he resigned as president of the company and left its employ. He subsequently sold his holdings of its preferred stock and severed his connection with it. He at once began arrangements to go again into the candy business. Some five weeks after his resignation he was the principal figure in organizing another Delaware corporation under the name of the Chocolate Products Company. He holds something more than three-fourths of its stock. Some of its advertising literature has been introduced into the record. It indicates that in this latest company he is, as he was in the complainant and its predecessor, the principal, and indeed the only, personality in evidence. It appears to have begun the business of making and selling chocolates as early as November 1, 1913, for on the 19th of that month it filed an application for the registration of the autograph signature of the defendant as its trade-mark. The defendant then made affidavit that the mark in question had been continuously used in its business since the first of the month. The defendant says that none of the chocolates manufactured by the Chocolate Products Company were made according to the formulas

which had been used by the complainant. He says that he invented new recipes therefor. During the past winter defendant prepared and caused the Chocolate Products Company to issue 50,000 copies of a circular. In it, among other things, it was said:

"That our president, Mr. Charles G. Guth, is acknowledged the greatest chocolate expert in the world and devotes his entire time to the manufacture of our goods. Mr. Guth for the past ten years was president and general manager of the Guth Chocolate Company and originated the famous Guth chocolates which are now sold all over the world at $1 a pound."

He prepared another circular letter to be addressed to an individual in each city or town in which he desired to establish an agency for the sale of the candies. It bears date March 9th last. In it he said:

"I am about to place on the market the finest line of 80-cent per pound chocolates," etc. "These will be put out under my individual name as chocolates by Charles G. Guth. I am using my full individual name in order that the public may not confuse my products with those of the Guth Chocolate Company, as I have sold all my interest in that company and have no connection whatsoever with the same. I am about to appoint one agent in every town for the sale of chocolates by Charles G. Guth. My reputation will stand behind every box that is sold, and, if you desire to have the agency for the sale of chocolates by Charles G. Guth for the city of ——, please advise me at once."

Only some 500 of these were sent out before the filing of the bill in this case. Some 5,000 of another circular addressed to buyers of candy and signed "Charles G. Guth, President," were issued. This circular, among other things, said, "Here are the best candy values I ever made." From Dun's and Bradstreet's he took a list of all the druggists, fancy groceries, department stores, and jobbing confectioners with satisfactory ratings. They numbered in all about 40,000. He sent circulars to all of them.

The larger part of plaintiff's business has always been the manufacture and sale of chocolates which retail at 80 cents and $1 a pound, respectively. Upon the packages containing the former, the word "Guth" appears. On those in which the latter was offered for sale, the word "Guth" was preceded by the preposition "by" in its French form of "Au." This word, as it appeared on the boxes in which the candy was contained, was in the same form of script in which the word "Guth" was exhibited; that is to say, the packages of $1 chocolates were marked "Au Guth." A number of the witnesses refer to those chocolates as "Au Guth" candies. The defendant is not now offering any $1 a pound chocolates. The plaintiff complains of the way in which he is putting on the market chocolates which are to be sold at 80 cents a pound. Their candies had long been known as Guth chocolates. On the outside of his packages appears in the facsimile of his own writing "Chocolates by Charles G. Guth." Upon them also appears a crest. These boxes of "Au Guth" chocolates are similarly adorned. The color scheme of the two crests are not unlike. In each of the crests the colors used are red, green, and gold. They would not seem similar to an heraldic expert, except that from his standpoint neither would in all probability be in accordance with the rules of heraldry. No one having the two side by side

would for a moment confuse them. Crests are common adornments of boxes of high-grade candies. All that can be said is that plaintiff and defendant both use crests. The combination of colors is about the same. A purchaser, who would otherwise be likely to confuse the two packages, will not be kept straight by the difference in the crests.

The chocolates defendant puts out under his name are manufactured by the Chocolate Products Company. He has told that fact to the trade. The packages are the only things which usually come · before the eye of the ultimate purchaser. There is on them absolutely nothing to indicate that there is or ever was any such concern as the Chocolate Products Company. The defendant's own name, Charles G. Guth, is all that appears. It is used at least four, if not six, times on or in every box. On the top of the package is "Chocolates by Charles G. Guth." When the box is opened, the same words appear impressed upon a piece of tin foil covering the top layer of candies. On the inside of the top is to be found the statement:

"I guarantee these delicious chocolate confections to be the purest and finest that can possibly be produced regardless of price."

Then follows a facsimile of his signature "Charles G. Guth," and below that the statement:

"None genuine without the full facsimile signature of Charles G. Guth, Baltimore, Md., U. S. A."

Sometimes the boxes are covered with transparent paraffin paper, which is kept in place by one or more seals, on each of which appears "Chocolates by Charles G. Guth" in a diminutive facsimile of his handwriting. Defendant says that no appreciable number of persons would confuse his package with the package of the plaintiff. He produces various witnesses who so testify. All of them have had considerable experience in candy selling, some of them a great deal. They say that the difference in shape between the plaintiff's and defendant's boxes will sufficiently distinguish the goods. The box in which, until recently, plaintiff has marketed his chocolates is a third shorter than defendant's; defendant's is only two-thirds as high as plaintiff's. This evidence would be more persuasive if plaintiff had always used the same shape of box for all its products. It has not done so. Defendant himself, while in control of the plaintiff, prepared a circular which he called "The Sweetest Story Ever Told." It was intended for circulation among consumers of candy. He says about a million copies of it were distributed. It contained cuts of packages used by the plaintiff. They are shown in widely different shapes and sizes. The one thing which they have in common is that each and all have the word "Guth" in its characteristic script. Until the summer of 1913 it is true that ordinarily the plaintiff's chocolates were sold in boxes of the size and shape of which defendant's witnesses speak. It is equally well established that before the defendant left plaintiff's employ it had begun to put out chocolates in a box which was slightly longer and slightly lower than that which defendant uses. Defendant's box is in shape, therefore, nearer to

either plaintiff's old box or to plaintiff's new box than either of them is to the other. At the time plaintiff made up its mind to use another style of box it does not appear that either defendant or any one else supposed that the change would injuriously affect its trade. It has been customary for the plaintiff to have on its boxes of 80-cent chocolates a blue label of attractive design upon which the word "Guth" in the usual form and the word "chocolates" appear. Defendant's witnesses say that the absence of this label will at once attract attention. The plaintiff put out other boxes of other kinds of candies which either did not contain any label at all or a label of another color.

Plaintiff has its experts also. It puts on the stand such witnesses who swear that the buyer of candy will inevitably confuse defendant's chocolates with those of plaintiff's. They say that unscrupulous retailers will have little difficulty in selling one for the other. These witnesses have also sold much candy at retail. One of them emphasizes his conviction by the statement that 80 per cent. of the expensive candies are sold to men. From the depth of his experience he adds, "Women are the shrewdest shoppers, and men are the most easily buncoed."

For one set of experts to swear against another is common enough. In such cases the court is usually very little helped by anything which they came on the stand to tell. Occasionally, accidentally, or incidentally something comes out which does throw light on some issue to be decided. Defendant himself tells a story which shows that, if such an article of candy once becomes known to the purchasing public by such a name as "Guth," no difference in the style, appearance, or legends upon the package will prevent confusion.

The first Guth Chocolate Company, the Maryland corporation, which subsequently went into receivers' hands, put out 60-cent chocolates. These it called "Guth Gold Medal Chocolates." The words "Guth Gold Medal Chocolates" were prominently displayed on the box in which the candy was offered for sale. They were inclosed in an oval made up of representations alternately of the obverse and reverse side of medals of the color and of about the diameter of a gold dollar. The appearance of these boxes differed widely from that of those in which the 80-cent goods were sold. The distinction was further accentuated. An actual metallic disc or medal was fastened to the 60-cent chocolates and sold with it. Nevertheless purchasers so confused the two kinds that the company was forced to abandon altogether the sale of the gold medal variety.

Plaintiff's 80-cent and $1 chocolates have always been dipped by hand. This has heretofore been true of all the high-grade chocolates. The cheaper grades have been machine dipped, as are defendant's. He says that they are all the more wholesome for that. They, however, show some of the characteristic signs of machine-made goods. To the extent they do they resemble the poorer qualities which have heretofore been marketed. Purchasers who buy the candies for those of plaintiff may be led to suppose that the latter is not now making as fine goods as it formerly did.

There is some testimony that defendant's goods have already been confused with those of plaintiff's. There is not a great deal of it. Plaintiff filed its bill before much of defendant's candy had been offered for sale at retail. In so doing it acted in accordance with the view of Lord Blackburn, when he observed that:

"Plaintiffs judged it necessary to proceed without waiting until actual deceit was proved, and I think they judged rightly, for, as Lord Justice James said (13 Chancery Division, 464), the very life of a trade-mark depends upon the promptitude with which it is vindicated." Johnston v. Ewing, Law Reports, House of Lords, 7 Appeal Cases, 219.

The wisdom of so acting has been illustrated in this case. Defendant hardly denies that plaintiff is entitled to some relief. He admits that perhaps in some respects he has not been as careful as he might have been so to exercise his rights as not unnecessarily to infringe upon those of plaintiff. He says that, if such be the case, he has gone astray through carelessness and inadvertence and not with evil intent.

The temporary restraining order has been interposed before much harm has been done to the plaintiff and before such an order could damage defendant, as it would if he had already built up a large trade in goods presented to the public in a guise which he was subsequently forced to abandon. To use a phrase of late on many tongues, the plaintiff has sought and obtained the assistance of the court before the eggs had been scrambled, perhaps before they had been even badly cracked.

Yet there is evidence that defendant has caused confusion. He has told the trade that he is no longer in the employ of the plaintiff. He has clearly stated to the retailers that his chocolates are now made by the Chocolate Products Company, and that such company has no connection with the plaintiff. It is hard to get people to understand. It appears that even proprietors and clerks of some stores which had been in the habit of selling plaintiff's candies did not yet appreciate that defendant's were not plaintiff's. Many who do know the situation will not feel that they are doing anything very wrong or perhaps anything wrong at all if they hand a customer who asks for Guth's chocolates a package of defendant's. The latter they would say is Guth's. One who speaks of the administration of Adams may have in mind either that of the second or of the sixth President. One of the plaintiff's witnesses in each of two southwestern cities sent into a drug store for a pound of Guth's chocolates. In each case he received a box of defendant's. Retailers have a strong inducement to sell defendant's goods instead of plaintiff's. They can get them at least 10 per cent. cheaper. They both retail at 80 cents.

It further appears from the testimony of one of defendant's own salesmen, when he was examined as a witness for him, that he usually tried, before going elsewhere, to get the man who sold plaintiff's candies to undertake the selling of defendant's. Whenever such efforts were successful, many of the ultimate consumers would inevitably obtain defendant's goods without learning that they were not the same they had frequently bought.

In considering how serious may be the possibility of confusion, the nature of the article dealt in must be borne in mind. Those who are minded to buy pianos, steam boilers, safes, typewriters, sewing machines, or farm wagons are likely to make some more or less careful inquiry as to what they are getting. The matter is important enough to make it highly probable that they will read and understand anything which may appear upon the article or in the circulars or advertisements in which it is habitually offered for sale. The case is different with comparatively cheap products, such as of food or drink, which perish in the using. It was one of such, viz., ales, that Lord Macnaghten spoke. He said that if, in the case before the House of Lords, the defendant had been required to distinguish his ales from those of the plaintiff, he "could not have used the term 'Stone Ales' at all. It would have been impossible for him to have called his ale Stone Ale and to have distinguished his ales from those of the plaintiff. Any attempt to distinguish the two, even if honestly meant, would have been perfectly idle. Thirsty folk want beer, not explanations. .If the public get the thing they want, or something near it, and get it under the old name, the name with which they are familiar, they are likely to be supremely indifferent to the character and conduct of the brewer and the equitable rights of rival traders." Montgomery v. Thompson, Law Reports (1891) Appeal Cases, 217.

To be of any use, the explanation must be made when and as each sale takes place. Unless it appears upon the goods or upon the packages in which they are sold, it will seldom be made at all. Defendant's boxes tell nothing as to his changed relations. On them Charles G. Guth takes the place of Guth. That is all. To most purchasers such a substitution suggests nothing. It is possible, rather than probable, that some may suppose that it has significance. What, they cannot tell. On defendant's boxes his name is the only identifying word. Those who want candy are not likely to remember his Christian name, much less to repeat it. They will call his candies Guth's, because there is nothing else they can call them. The harm done the plaintiff will not stop here. Defendant's candies are so put upon the market that many who want plaintiff's will suppose that the only way to be sure of getting them is to buy what will in fact be defendant's. The statement in his boxes that "none are genuine" without his full facsimile signature suggests that his alone are the original, the plaintiff's imitations.

In most trade-mark cases both parties have equal right to make, if they choose, the same goods in the same way. Such is not the case here. It is true that neither plaintiff's candies nor its ways of making them are patented. They are made according to secret recipes. Defendant sold these formulas to the plaintiff. Any one who can, without breach of personal faith, find out how to make them may do so without plaintiff's leave or license. Defendant may not. He sold those formulas to the plaintiff. Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67. He says he does not make them. In his assignment to the plaintiff he included all improvements which might thereafter be made in the formulas transferred. He explains that he now makes no use whatever of them, whether in their original form or in any improve-

ments thereon. His candies, he states, are made by entirely new recipes of his recent invention. He claims they are better than any he ever made for the plaintiff or that the plaintiff ever made for itself. If so, the more sharply his goods are distinguished from those of the plaintiff, the better for him. He is an unquestioned authority on candies. Still, taste is a peculiar thing. It may be that a considerable proportion of candy eaters may not think his goods are more toothsome. They have rights. When they are asked to buy defendant's candies, they should be told they are not getting what they have long known and liked and that they are asked to give their money for something else, although they do not know whether they will like it or not.

Defendant professes that his wish was and is to make clear the distinction between himself and the plaintiff, between his goods and its. He appears to have had the same bad luck which has often attended his predecessors in like ventures. Many judges have commented upon the strange fate which so frequently overtakes the second comer into an already well occupied market. He always wants to let every one know that he is offering something other than that which the other concern has sold. In some way or other every effort he makes to distinguish confuses. Persons so situated have been before compared to inexperienced bicycle riders who are prone to run into obstacles they are desperately striving to avoid. Some such psychological tendency may justify a charitable explanation of what otherwise appears to be an attempt to filch another man's trade.

Courts cannot look into the secret of human hearts. They can only judge the intention of responsible and experienced men by the natural outcome of their acts. If what they do will, in the ordinary course of events, tend to confuse their goods with those of others, the courts must assume that they purposed to bring about that result. This rule is of special applicability to the case at hand. There is in this record much advertising literature of defendant's composition. He appears to be an expert in that line of endeavor. If he wishes to create a particular impression on the public mind, he knows better than most how to do it. It follows that the defendant must be held to have gone beyond the line of fair competition. The plaintiff is entitled to some relief. What its measure should be is the seriously controverted question.

Defendant at the hearing tendered himself ready to consent to any decree which will, first, permit him to display prominently in some form the name Charles G. Guth on his candy boxes, and, second, will leave him free to offer his candy in attractive packages. Plaintiff insists that it will suffer if defendant's name appears in any way either upon the boxes in which his candy is sold or upon any poster, circular, or other advertisement of it.

From what has been already said, it follows that defendant's name on candy boxes will do the plaintiff serious injury. It is possible that some harm will result to it if that name, though not exhibited on the boxes themselves, is conspicuously displayed upon his advertising literature. Conceding so much to be true in fact, what legal consequences follow?

Every man who has not voluntarily imposed limitations upon himself may engage in any lawful business and may in it use his name in all ordinary ways. No man may lawfully sell his goods as those of another. Each of these principles is almost self-evident. They are each of universal, or well-night universal, application. Ordinarily they do not come into conflict. Sometimes in fact or in seeming they do. Many cases deal with some aspect or another of a real or alleged confusion which has resulted from the way in which two persons with a like surname have used it in competition with each other. In some of them emphasis has been laid on one of the two general doctrines above stated, while in others the reverse has been true. In what has actually been decided there is not much conflict. There are cases and of high authority which cannot be reconciled. Considering the difficulty of the subject, they are surprisingly few. A statement of the law as it now appears to be well settled will show that the decision to be here made must, after all, turn on what may appear to be a very narrow point.

[1] One man may have long been engaged in the production and sale of a particular kind of wares. He may have been the only person of that name who made or sold them. They may have acquired a widespread and valuable reputation. Any goods with which a like surname may be used will be taken for his. Nevertheless any man who has that surname may go into the same business and offer the like goods for sale. A good deal of confusion will necessarily follow. The first comer will suffer from it. If the second does nothing unnecessarily to increase the difficulty of distinguishing his goods from those of his predecessor, the latter will not be heard to complain. Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247; Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972; Burgess v. Burgess, 17 Eng. Law & Equity, 257.

The reputation of the old concern may have had its part in leading the new man to go into the same business. Even so, he is within his rights. He must not purposely do anything to confuse his products with those of his rival. He may be called on to take reasonable precautions to prevent the purchasing public from mistaking the one for the other. He cannot be required to that end to do anything which will disparage his own goods or advertise those of his competitor. Walter Baker & Co., Ltd., v. Gray, 192 Fed. 921, 113 C. C. A. 117; Wm. Rogers Mfg. Co. v. Rogers (C. C.) 84 Fed. 639. The right to use one's name in all ordinarily legitimate ways is absolute in the absence of contract, fraud, or estoppel. Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972.

When two men with the same surname are competitors, there are usually many things which one of them may easily do to lead those who want his rival's goods and who think they are getting them to take his. He often yields to the temptation. For the purpose of undoing what he has done, and to guard against the consequences of any repetition of it, he may be compelled to take precautions which otherwise would not have been required of him. Herring-Hall-Marvin Safe Co. v.

Hall Safe Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616; Walter Baker & Co., Ltd., v. Baker (C. C.) 77 Fed. 181; Croft v. Day, 7 Beav. 88; David E. Foutz Co. v. S. A. Foutz Stock Food Co. (C. C.) 163 Fed. 408; Russia Cement Co. v. Le Page, 157 Mass. 206, 17 N. E. 304, 9 Am. St. Rep. 685. Where he has greatly offended, he may be strictly restrained. He may be even prohibited from using his name in ways which ordinarily would be freely open to him. Herring-Hall-Marvin Safe Co. v. Hall Safe Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616; Garrett v. T. H. Garrett & Co., 78 Fed. 472, 24 C. C. A. 173; Pillsbury v. Pillsbury-Washburn Flour Mills Co., 64 Fed. 841, 12 C. C. A. 432; Stuart v. F. G. Stewart Co., 91 Fed. 243, 33 C. C. A. 480; Sykes v. Sykes, 3 Barnewall & Cresswell, 541; Van Stan's Stratena Co. v. Van Stan, 209 Pa. 564, 58 Atl. 1064, 103 Am. St. Rep. 1018.

In such cases the unrestricted use of his name is no longer his. He has lost it as the result of what he did, but, nevertheless, he has not willingly parted with it. If it may be taken from him because of his wrongdoing, he may as certainly, and perhaps even more completely, part voluntarily with it.

Plaintiff says the defendant now at this bar is bound by his contract not to use his name in the sale of candy, and that, even if that were not so, he has put his name to such tortious ends that the court must place bounds on the ways in which he may hereafter employ it. He sold the good will of his business to the plaintiff. Quite clearly such a sale does not amount to an undertaking not to re-enter the same calling. Trego v. Hunt, Law Reports (1896) Appeal Cases, 7, 20.

[2] A man may so identify his name with his goods as to give it a secondary meaning. He may want to sell his business. In order to do so, it may be necessary for him to transfer the exclusive right to the use of his name in connection therewith. Even such a contract will leave him free to go into the same kind of business, though he may not employ his name to push the sale of his wares. Frazer v. Frazer Lubricator Co., 18 Ill. App. 450; same case on further appeal, 121 Ill. 147, 13 N. E. 639, 2 Am. St. Rep. 73; Le Page v. Russia Cement Co., 51 Fed. 941, 2 C. C. A. 555, 17 L. R. A. 354.

In Howe Scale Co. v. Wyckoff, Seamans & Benedict, supra, the Supreme Court impliedly recognized that such a sale may be valid. That it is and will be judicially enforced has been decided in a number of cases, some of them of high authority. Russia Cement Co. v. Le Page, 147 Mass. 206, 17 N. E. 304, 9 Am. St. Rep. 685; Le Page v. Russia Cement Co., supra; Frazer v. Frazer Lubricator Co., supra; Brewer v. Lamar, 69 Ga. 656, 47 Am. Rep. 766; Grow v. Seligman, 47 Mich. 607, 11 N. W. 404, 41 Am. St. Rep. 737; Shaver v. Shaver, 54 Iowa, 208, 6 N. W. 188, 37 Am. Rep. 194; Spieker v. Lash, 102 Cal. 38, 36 Pac. 362; Symonds v. Jones, 82 Me. 302, 19 Atl. 820, 8 L. R. A. 570, 17 Am. St. Rep. 485.

But, while the right of a man to use his name in his own business is not inalienable, it is fundamental. An intention entirely to divest him-self of it and transfer it to another will not readily be presumed but must be clearly shown. Hazelton Boiler Co. v. Hazelton Tripod Boil-

er Co., 142 Ill. 494, 30 N. E. 339. The application of this rule to the facts of the case at bar requires denial of at least a part of the relief for which the plaintiff asks.

Two of the questions to be passed upon are whether such conveyance does not estop the defendant, first, to deny that the surname "Guth" had become a true trade-mark; and, second, to assert any right to use that name as a trade-mark whether with or without any additions in any way likely to confuse his goods with those of the plaintiff. No matter how they may be answered, they are obviously relevant solely to the use of a name as a trade-mark.

[3] A trade-mark must in some way be affixed or attached to the goods to be designated by it or to the packages in which they are sold. The exclusive right to it can be secured in no other way. Singer Mfg. Co. v. Wilson, Law Reports, 2 Chancery Div. 434; Oakes v. St. Louis Candy Co., 146 Mo. 391, 48 S. W. 467; Hazelton Boiler Co. v. Hazelton Tripod Boiler Co., 142 Ill. 494, 30 N. E. 339.

It follows that the mere assignment by the defendant to the plaintiff of the trade-mark of the Guth Chocolate Company of Baltimore City did not give it any right to require him to refrain from the use of his name in his business otherwise than by actually or constructively affixing that name to the candies or to the packages in which candies were sold.

[4] In addition to conveying to the plaintiff the trade-marks of the former company, defendant sold it "the use of the name 'Guth' for the purpose of manufacturing and selling candies under the Guth label."

Had the parties wished that the defendant should not thereafter be free to use his name at all in the candy business, the words "under the Guth label" would have been superfluous. The defendant, of course, intended that the plaintiff should continue to call itself by the name which he had given it. It might freely advertise its goods by that name, which was the name he expressly authorized it to use upon them. His participation in its organization, his conveyance to it of the trade-marks of its predecessor, would have given it that much without any other express grant. But neither the grant of one nor the other or of both combined would have taken from him the right to use his name in the same business. If he bargained that right away, it must have been by the conveyance of the right to use the name "Guth" for the purpose of manufacturing and selling candies under the Guth label. That language, however, is restricted to a particular kind of use of that name.

In view of the rule of law which requires an intention to convey an exclusive right to the use of one's own name to be clearly shown, it must be held that the defendant has not deprived himself of the right to employ his name in the candy business otherwise than on the candies themselves or upon the packages in which they are offered for sale. The right to use one's own name, however absolute and fundamental, does not authorize its employment for the purpose and with the intent of doing unnecessary mischief to others. One competitor in business may so use his name as to induce purchasers to buy his goods when they wanted those of his rival. If he does, he may be required thereafter in his advertising literature to add to his name such explanatory

matter as will render such confusion difficult, if not impossible. Stix, Baer & Fuller Dry Goods Co. v. American Piano Co., 211 Fed. 271, 127 C. C. A. 639.

In view of all the facts and circumstances heretofore cited, the defendant may be properly required to give notice upon all literature, posters, etc., in which his name is used and which are intended to come under the eye of the ultimate consumers of his candies, that they are made by the Chocolate Products Company and not by the older Guth Chocolate Company, and that they are compounded under different formulas. This notice should be as conspicuous as his own name. He will be free to make whatever comparisons he may think just, and if need be can justify, between the products he is now making and those which the plaintiff offers for sale.

The most difficult problem still remains. Has defendant parted with the right to use his name on candies and on the containers of candies? To the parties that is the vitally important question. While a bargain to shut one's self out of the right to use one's own name for any legitimate purpose will not be presumed, but must be proved, such proof may doubtless be made in various ways. In determining whether such an agreement has been entered into, all the facts and circumstances of each particular case must be taken into consideration. Much depends upon the nature of the business conducted and of the wares dealt in. It may sometimes be clear, as it is here, that the right to use defendant's surname has been given to plaintiff. If such right will be of little worth if not exclusive, the courts will be somewhat more ready to find in the words used an intent on the part of the grantor to part with all right to the use of his name than they will where the two parties may simultaneously use that name with relatively little inconvenience.

In this case, as has already been pointed out, the character of the wares dealt in is such that the use of the same surname on candy boxes will lead to continual and serious confusion.

At the time the defendant made the sale to the plaintiff, he was thoroughly familiar with the nature of the candy business. Whatever he did or said was done or said with reference to the conditions prevailing in that trade. So much cannot be seriously disputed. Even so, the parties are in direct opposition as to the legal consequences which should follow. As might have been expected, each of them has been able to marshal, in support of its contention, apt quotations from opinions of courts of high reputation for sound judgment and broad legal learning. As is not uncommon, what was said in those cases is in far sharper contrast than that which was done.

This opinion is already far too long. A detailed discussion of many of these cases would greatly extend it without corresponding profit. Among them are two which in many of their facts are very similar to those now before the court. It so happens that one of them is the principal reliance of the plaintiff; the other of the defendant. An examination of them will afford sufficient opportunity to make clear the legal considerations which are thought to be here controlling. It will be most convenient to speak first of the case cited by the defendant.

It was decided some eight years ago by the Supreme Court of Pennsylvania. The defendant in it had begun the business of manufacturing chocolate chips, which were sold as Trowbridge's Chocolate Chips. He formed a copartnership to carry on the business. Subsequently he withdrew from the firm. He made a written agreement with his partners. It recited that the partnership had been formed especially for the manufacture and sale of the quality of confectionery known by the trade-mark of Trowbridge's Original Chocolate Chips. By it the defendant sold all his "right, title, interest, property, and claim" to and in all the partnership business, rights, and property. Among the things specifically assigned was the good will of the business. He shortly resumed business in his own name and town. He, too, manufactured and sold chocolate chips. He put his name "W. S. Trowbridge" on the packages in which he offered them for sale. In other respects there were striking differences in the markings of his goods from those of the copartnership. The latter sought an injunction against him. They alleged that by the transfer of his interest in the good will of the business he was precluded from entering into a similar one in the same town and prosecuting it in competition with them. This contention was naturally held wholly untenable. Under all the circumstances, the court thought that what the plaintiff feared was not that the public would be deceived, but that, if the fact became known that the defendant was engaged in the same business, the public would purposely purchase the goods made by him because he was the first person who ever made them. It thought that the plaintiff wanted protection from the business competition of the defendant carried on openly and frankly by him under his own name. It found nothing in the agreement to show that he had ever intended to put himself under such bonds.

The plaintiff claims that Le Page v. Russia Cement Co., 51 Fed. 941, 2 C. C. A. 555, 17 L. R. A. 354, cannot be distinguished from the case now at bar. It was decided by the Circuit Court of Appeals for the First Circuit. The opinion is from the pen of Judge Putnam. It is learned and able. Mr. Justice Gray sat in the case and united in the opinion. It was decided in 1892. White v. Trowbridge, 216 Pa. 11, 64 Atl. 862, not until 1906. It is somewhat curious that in the opinion of the latter no reference is made to the former. Le Page had been in the glue business. He extensively advertised his glues as Le Page's and sold them as such. He and one Brooks formed a partnership. They traded as the Russia Cement Company. In 1882 they incorporated under the same name. Le Page and his partner by bill of sale transferred the business and property of the firm to the corporation. A copy of such bill of sale has been offered in evidence in this case. In it the parties conveyed to the corporation "the good will of the business and the right to use the trade-marks belonging to or in use by said copartnership." Subsequently Le Page severed his connection with the company and formed another which he called by his own name. Upon its packages appeared the words "Manufactured by the Le Page Company." It was held that in so labeling them he had infringed upon the rights of his grantee. It was pointed out that the

215 F.—49

Russia Cement Company had a threefold right to recover. First, it had become the owner of whatever trade-marks were owned by Le Page or by the partnership. The plaintiff now before this court has all the trade-marks which prior to March, 1909, belonged either to the defendant or to the Guth Chocolate Company of Baltimore City. Second, the Russia Cement Company had acquired, both by express contract and by implication of law, the good will which accompanied the trade-marks of the business. In this case the defendant expressly conveyed to the plaintiff the good will of the previous business. Third, independently of all questions of trade-marks or good will, the Russia Cement Company, in common with every manufacturer and trader, had the fundamental common-law right to be protected against those who offer to the public products or merchandise simulating its. To such right the present plaintiff may lay equal claim. The court was careful to show that its ruling was not oppressive to those who had built up profitable businesses under their own surnames. On the contrary, in the long run it would greatly advantage a majority of them. Such a person should have the privilege of realizing the fruits of his labor by transmitting to purchasers his business and establishment with the reputation which has attached to them. The more exclusive the title he can convey the better the price he may command. It was said that there is a great difference between dealing with a local community understanding all the circumstances and dealing with the great public scattered throughout the United States with no opportunities of information except what is communicated to them by the word "Le Page" in combination with the word "glue."

Plaintiff's goods are sold in every state of the Union. Defendant has by his circulars solicited customers over an equally extensive territory. The purchasers of candy, equally with the purchasers of glue, are without any other opportunities of information except what is communicated to them by the word "Guth" in combination with the word "chocolates."

It was regarded as a significant circumstance that the Russia Cement Company sold its products to customers and subcustomers to the amount of more than $60,000 annually. The sales of the plaintiff under the Guth label are at least four or five times as great. Glues, on account of their very peculiar character, go into the hands of many hundreds of thousands of persons nearly all ignorant of the circumstances connected with their origin except what is suggested by the word Le Page. Candies go into the hands of at least an equal number of people whose ignorance on the subject of their origin is quite as profound.

The Circuit Court of Appeals did not think that "the shape of the packages, the color of the labels, or the peculiar adornments put upon them, or any arbitrary designations, form essential parts of what was left behind him by Le Page when he withdrew from the plaintiff corporation, or of what was transferred to it by the partnership."

There is nothing in this record to suggest that any such features formed the really essential part of what the plaintiff bought from the defendant.

In the First Circuit it was held that the essential thing was the Russia Cement Company's "right to inform the public that it is in the exclusive possession of all the advantages coming to it as the legitimate successor of the original formulator of Le Page's glue and is alone entitled to put on the market that product, supposed to be composed or manufactured with special skill and known to come from the original and long-established concern."

In the instant case the essential thing assigned by the defendant to the plaintiff was the right to tell the public that it is in the exclusive possession of all the advantages coming to it as the legitimate successor of the original formulator of Guth's chocolates, and that it is alone entitled to put them on the market.

Judge Putnam further held that, in view of the nature of the business and of the kind of products dealt in and the character of the persons who bought and used them, there was no essential difference between the words "Le Page's Glue" and the words "Glue made by Le Page" or "Glue made by the Le Page Company." He added:

> "It would be mere self-stultification for this court to assume not to see, what every practical person of intelligence must see, that for the innumerable persons dealing with this class of merchandise, or with such merchandise as the Day and Martin Blacking. covered by Croft v. Day. 7 Beav. 84, the words 'Le Page's Glue,' and 'Glue Manufactured by Le Page,' or the words 'Day and Martin's Blacking,' and 'Blacking Manufactured by Day and Martin,' mean, or soon come to mean, one and the same thing, and that both will inevitably be soon styled alike in the market."

There can be no question that "Chocolates by Charles G. Guth" will be known to the public as "Guth's Chocolates."

The opinion in the Le Page Case has been so fully reviewed and such extensive quotations have been made from it in order to demonstrate that it is impossible to distinguish the facts of that controversy from those of the one now to be determined. Defendant, it is true, attempts to do so. Judge Putnam states that the opinion in the Russia Cement Company v. Le Page, 147 Mass. 206, 17 N. E. 304, 9 Am. St. Rep. 685, contains an accurate statement of facts. Defendant says that it appears both from Judge Putnam's opinion and from that of the Supreme Judicial Court of Massachusetts that both of them thought that Le Page had purposely sought to mislead the ultimate purchasers of glues. The defendant here contends that he did not. What he has done has been heretofore fully set forth. The legal interpretation which must be put upon his acts has been already stated. It follows that the distinction he seeks to make has no foundation in fact. It is, however, quite doubtful whether the ruling in either of the cases would have been different had Le Page been held altogether free from any wish to deceive. The rights of the Russia Cement Company were expressly held to be based on his contract rather than on his tort. The important question in the end resolves itself into the query whether this court should accept and apply the doctrine laid down by the Circuit Court of Appeals for the First Circuit. It does not appear that in any of the subsequent federal cases in the Supreme, or in any of the inferior courts of the United States. its reasoning has been unfavorably criticised or its authority in any wise shaken. It is true that

much which was said in White v. Trowbridge is not in harmony with Judge Putnam's argument. Whether Judge Potter, who spoke for the Supreme Court of Pennsylvania, had considered the Le Page Case does not appear. Technically neither decision is binding on this court. Doubtless in a District Court of the United States the utterances of a Circuit Court of Appeals of another circuit are entitled to somewhat more weight than are those of a state court of another state, no matter how great and how deserved may be the reputation of the latter. Apart, however, from any such technical considerations, the opinion in the case in the federal court seems more persuasive when applied to the facts of the particular case now under consideration.

The defendant must be enjoined from putting the name "Guth" with or without a prefix or suffix upon any candy or in or upon packages in which he offers candy for sale. It consequently becomes unnecessary to consider any of the questions as to the shape or color of the packages or of the crests or other adornments upon them.