## The LePage Co. *v.* Russia Cement Co.

*(Circuit Court of Appeals, First Circuit. September 15, 1892.)*

### No. 17.

1. **ASSIGNMENT OF RIGHT TO USE OF NAME—INFRINGEMENT BY ASSIGNOR.**
   One LePage, having originated and sold extensively throughout the United States an article styled "LePage's Glue," organized a corporation, to which he transferred the assets and good will of the business. He continued active in the corporation for some time, after which he sold all his stock, and retired therefrom. Subsequently he manufactured individually a similar article, which he sold as "Glue made by LePage," and thereafter formed a new corporation, "The LePage Company," which sold the article as "Glue Made by The LePage Company." *Held*, that this was a violation of the right acquired by the original corporation to the use of the name "LePage" in connection with glues.

2. **SAME—FRAUDULENT INTENT.**
   Where such infringement is clear, proof of actual fraudulent intent is unnecessary.

3. **SAME—PATENTED PREPARATION.**
   The rights of the original corporation were not affected by the fact that, after retiring therefrom, LePage obtained a patent on an alleged improvement over the original glue, and that the patent laws (Rev. St. § 4900) required notice to be stamped on each package of the patented article.

4. **SAME—ASSIGNMENT—ESTOPPEL.**
   The LePage Company, by accepting the assignment of the patent, and allowing LePage to manage and control its business, barred itself from denying that it was proceeding under his authority and as his successor, and therefore it could have no greater rights, as against the original corporation, than LePage himself.

5. **SAME—ESTOPPEL.**
   So me time before commencing the suit, the attorney for the original corporation, referring to prior litigation in the state courts, wrote as follows to defendant's

attorney: "The Russia Cement Company are not disposed to file a new bill against your client's use of the name 'LePage Company,' as long as they keep themselves strictly within present lines. I have advised the Russia Company that the use of that name is a violation of their rights as heretofore defined by the decisions of the court, but they think that, in view of those decisions and the publicity which has been given to them, the use of their name, in the present manner, is not likely to do them harm enough in the long run to make it worth while to bring another suit." *Held,* that this did not constitute an estoppel, and in an action at law could have no effect upon the question of damages.

6. SAME—PLEADING.

The declaration alleged that defendant, "since the 1st of November, 1888, knowingly, willfully, and fraudulently offered for sale, and is now selling, glue in packages," etc. *Held* that, as there was no *continuando* with reference to the matter of selling, only one actual sale could be proved under the common-law rule, which has not been changed by the Massachusetts statutes relating to pleadings.

Error to the Circuit Court of the United States for the District of Massachusetts.

Action by the Russia Cement Company against The LePage Company to recover damages for the wrongful use of the name "LePage" in connection with glues manufactured by defendant. The court ruled that defendant's use of the name was a violation of plaintiff's rights, and that the only question for the jury was the amount of the damages. A verdict was returned for $8,000, and judgment entered thereon. Defendant brings error. Reversed.

*S. Henry Hooper,* (*Eugene P. Carver* and *William C. Cogswell,* of counsel,) for plaintiff in error.

*Charles H. Drew* and *Payson E. Tucker,* for defendant in error.

Before GRAY, Circuit Justice, and COLT and PUTNAM, Circuit Judges.

PUTNAM, Circuit Judge. The court below instructed the jury, as a matter of law, that the words, "Manufactured by The LePage Company," on defendant's packages, were infringements. If it was proper to instruct the jury to return a verdict for the plaintiff, it is unimportant whether the court expressed itself in that form or in the form which was actually used. We are of the opinion that the court correctly instructed the jury on this topic; and this, of course, renders unimportant all the other exceptions of the defendant below, unless so far as they may touch the question of damages.

The essential facts are the same as stated succinctly in *Cement Co.* v. *LePage,* 147 Mass. 206, 17 N. E. Rep. 304, (decided June 10, 1888,) except the last step, which was taken subsequently to that case. William M. LePage established at Gloucester the business of manufacturing and selling various kinds of glues, which he put on the market in connection with his own name, "LePage;" and the same became known to the trade and public as "LePage's Glues," having been extensively advertised and sold as such at home and abroad. In 1880, LePage and his associate formed a partnership under the style of Russia Cement Company. In 1882 the partnership was incorporated as the plaintiff below, and the assets and good will of its business, including the trademarks, were transferred to this corporation; and LePage took an active part in the business of the partnership during its existence, became treasurer of the corporation on its organization, held that office until the au-

tumn of 1883, and continued active in the concern until February., 1886, when he sold all his stock, and severed his relations thereto.

It is to be noted, therefore, that the plaintiff below has a threefold right: *First.* Whatever trade-marks were owned by LePage, or the partnership known as Russia Cement Company. *Second.* The good will which accompanied the trade-marks and the business, both by express contract and by implication of law. *Menendez* v. *Holt*, 128 U. S. 514, 9 Sup. Ct. Rep. 143. *Third.* The fundamental right which every manufacturer and trader has at common law, and independently of all questions of trade-marks or good will, to be protected against those who offer to the public products or merchandise simulated as his. *Lawrence Manuf'g Co.* v. *Tennessee Manuf'g Co.*, 138 U. S. 537, 11 Sup. Ct. Rep. 396; *Chemical Co.* v. *Meyer*, 139 U. S. 540, 547, 11 Sup. Ct. Rep. 625.

It is equitable that a manufacturer or dealer, who has given reputation to any article, should have the privilege of realizing the fruits of his labors by transmitting his business and establishment, with the reputation which has attached to them, on his decease to his legatees or executors, or during his lifetime to purchasers; and it is also in accordance with the principles of law, and with justice to the community, that any trade-mark, including a surname, may be sold with the business or the establishment to which it is incident; because, while it may be that individual efforts give them their value at the outset, yet, afterwards, this is ordinarily made permanent as a part of the entire organization, or as appurtenant to the locality in which the business is established, and thenceforward depends less on the individual efforts of the originator than on the combined result of all which he created. *Kidd* v. *Johnson*, 100 U. S. 617; *Chemical Co.* v. *Meyer*, 139 U. S. 540, 548, 11 Sup. Ct. Rep. 625; *Hoxie* v. *Chaney*, 143 Mass. 592, 10 N. E. Rep. 713; *Cement Co.* v. *LePage*, 147 Mass. 206, 17 N. E. Rep. 304.

*Chadwick* v. *Covell*, 151 Mass. 190, 23 N. E. Rep. 1068, is properly distinguished in *Chemical Co.* v. *Meyer.* Trade-marks, good will, or rights to use the names of individuals, become, when sold, the property of the person to whom transferred, and do not thereafterwards rest on mere contract; and, without any specification in the instrument of transfer, and merely as inherent to the essential rights of property, they must, with all their incidents, be protected by the courts in the hands of the transferee against all assaults and artifices. In *Cement Co.* v. *LePage*, *ubi supra*, the supreme judicial court of Massachusetts said (page 211, 147 Mass., and page 306, 17 N. E. Rep.) that it did not decide that LePage might not use the words "Liquid Glue," or other appropriate words, to describe his product, or to state in that connection that he was himself the manufacturer. We have no occasion to deal with the long line of authorities, commencing with *Croft* v. *Day*, 7 Beav. 84, and *Holloway* v. *Holloway*, 13 Beav. 209, and ending with *Chemical Co.* v. *Meyer*, *ubi supra*, touching the ordinary inherent right of every person to the honest use of his own surname. These do not apply when the original right has been voluntarily parted with, as in the case at bar, nor have they been extended to corporations which have appropriated surnames for use in connection with proprietary articles; while they uphold with a

firm hand the fundamental doctrines of honesty and good faith as applied to this branch of the law, and have been vigilant in searching out and punishing evasions and artifices, even in connection with this primitive right. Neither are we embarrassed by *Furnace Co.* v. *Le Barron*, 127 Mass. 115. The opinion in that case was aimed at a mere question of fact, that is, whether the letters and numbers used on certain parts of stoves were any part of the trade-mark in question. The court held, as a matter of fact, that they were not. The court also ruled that, if in some instances purchasers from the vendees of the alleged infringer were deceived as to the origin of the goods, he was not responsible, using, however, the following language:

"But, as he publishes to the world the fact that he is the manufacturer of what he sells, and does not attach to his goods any label or mark apt to deceive subsequent purchasers from his vendees as to the origin of the goods, he cannot be regarded as infringing on the rights of the plaintiff."

The case at bar will be found to turn on the facts that the label or mark used in this case, so far from being inapt to deceive subsequent purchasers, necessarily tended, under the circumstances, to mislead the public, including subsequent purchasers, and also that persons of ordinary intelligence, honestly considering the natural results, must have foreseen that they would so mislead. It is, however, the law that the fact that the immediate vendees of one who infringes are themselves not deceived is ordinarily of no consequence; and the offense is none the less because the original vendors and vendees may all be parties to the fraud. *Wotherspoon* v. *Currie*, L. R. 5 H. L. 508, 517, cited and approved in *Lawrence Manuf'g Co.* v. *Tennessee Manuf'g Co.*, 138 U. S. 537, 11 Sup. Ct. Rep. 396.

Also we may lay aside the hypothetical case of the pursuit by LePage in Gloucester of the local manufacture of and traffic in glue, dealing with only the neighborhood, under such circumstances that no presumption of fraud or injury could arise. There being no express stipulation to the contrary, it is possible there was nothing in the case at bar, as matters stood when LePage retired from the plaintiff corporation, which would have shut him out from a local traffic as above supposed. This proposition was discussed in *Hoxie* v. *Chaney*, 143 Mass. 592, 597, 10 N. E. Rep. 713, and the retiring partner was permitted to continue the business in his own behalf; but he was subjected, however, to certain conditions which will be referred to again in another connection. While permitting this, the court (page 596, 143 Mass., and page 716, 10 N. E. Rep.) distinguished certain difficulties which might arise under a supposed state of facts which exist in the case at bar; among others, such as might occur when the business was not local in its character, but extended over a considerable region or line of travel.

The products of the Russia Cement Company are sold to customers and subcustomers throughout the United States, to more than $60,000 annually, and necessarily, on account of their very peculiar character, go into the hands, first and last, of many hundreds of thousands of persons, nearly all ignorant of the circumstances connected with their origin, except what is suggested by the word "LePage." This was the

condition of things in existence, or contemplated, when LePage surrendered his interest in the Russia Cement Company, and therefore must be taken into consideration by the court in determining the rights of the parties. On the other hand, the products of The LePage Company, of the same general character, have also been scattered in the same way to the extent of over $50,000 annually to innumerable persons, who were necessarily likewise ignorant of their true origin.

The difference is between dealing with a local community understanding all the circumstances, and dealing with the great public, scattered throughout the United States, with no opportunities of information, except what is communicated to them by the word "LePage" in combination with the word "glue."

Neither is the question in this case merely one of simulating arbitrary indications of the origin of merchandise, frequent in trade-marks. It does not appear that either the shape of the packages, the color of the labels, or the peculiar adornments put upon them, or any arbitrary designations, form essential parts of what was left behind him by LePage when he withdrew from the plaintiff corporation, or of what was transferred to it by the partnership; and as to all these the Russia Cement Company, so far as the case shows, reserves the right to modify and change as the tastes of the public, or the supposed attractiveness of its packages, may from time to time require. The essential thing is its right to inform the public that it is in the exclusive possession of all the advantages coming to it as the legitimate successor of the original formulator of "LePage's Glue," and is alone entitled to put on the market that product, supposed to be composed or manufactured with special skill, and known to come from the original and long-established concern.

Bearing in mind the peculiar circumstances to which we have referred, especially the fact that both parties are dealing with the public in the manner explained, we hold that for this case there is no essential difference between the words "LePage's Glue" and the words "Glue made by LePage," or "Glue made by The LePage Company." It would be mere self-stultification for this court to assume not to see, what every practical person of intelligence must see, that for the innumerable persons dealing with this class of merchandise, or with such merchandise as the Day and Martin Blacking, covered by *Croft* v. *Day, ubi supra*, the words "LePage's Glue," and "Glue Manufactured by LePage," or the words "Day and Martin's Blacking," and "Blacking Manufactured by Day and Martin," mean, or soon come to mean, one and the same thing, and that both will inevitably be soon styled alike in the market.

Independently of the particular principles of the law of trade-marks, it is the duty of the courts to protect the good will which the plaintiff below acquired from LePage, and its rights against merchandise adapted by him to supplant its own. This duty is also aside from all questions of artifice or fraud actually intended, though there may have been sufficient to have justified the court in advising a verdict for the plaintiff below on this ground also.

The LePage Company claims that, inasmuch as it owns a patent issued to LePage, it is its privilege and duty, under Rev. St. § 4900, to stamp on its products the names of the patentee and of The LePage Company, his assignee. Inasmuch as this patent was applied for after the rights of the Russia Cement Company accrued by the voluntary action of LePage, it is at once apparent that those rights cannot be affected by any condition of law relating to a patent also voluntarily acquired by LePage himself, even if the statute required the patentee's name. Moreover, the method of stating that the article is patented was such as to aggravate the offense of The LePage Company, instead of excusing it. The label on one of the bottles submitted in proof contains the following: The face of William N. LePage, a facsimile of his signature, and the words, "Wm. N. LePage is the original inventor of preserved liquid fish glue," etc.; and at the close follows: "Improved process, pat. Oct. 26, 1886." Perhaps, except for the alleged artifices of LePage and The LePage Company, which, if truly stated, may have brought about a detriment to the Russia Cement Company, now irremediable except by entirely refraining from the word "LePage" in any form in connection with glue sold by him or The LePage Company, a limited use by the defendant below might be permissible under certain circumstances. In *Hoxie* v. *Chaney*, 143 Mass. 592, 597, 10 N. E. Rep. 713, the court permitted Hoxie, notwithstanding his unlawful use of the trade-marks belonging to Chaney, to continue his own name for certain purposes under conditions stated; but a safer rule was insisted on in *Thompson* v. *Montgomery*, 41 Ch. Div. 35, affirmed in *Montgomery* v. *Thompson*, [1891] App. Cas. 217, cited and approved by the supreme court in *Lawrence Manuf'g Co.* v. *Tennessee Manuf'g Co.*, 138 U. S. 537, 550, 11 Sup. Ct. Rep. 396, as follows: Joule & Sons had long brewed ale in the town of Stone, in England, and their ale had become known as "Stone ale." The infringer established a brewery at Stone, for the fraudulent purpose of putting on the market his ale as that of the older brewers. The infringer offered to submit to an injunction, provided the qualification was added: "So as to induce the belief that the ale sold by the defendant is the ale of the plaintiffs." This qualification was refused, and the refusal was sustained by the court of appeal, and also by the house of lords. It is not necessary, however, to decide this proposition; and we only state it in order that it may not be inferred, from the omission to do so, that we intend to give countenance to any artifices whatsoever which will prevent the full restoration to the Russia Cement Company of its original rights, unimpaired and unprejudiced.

The plaintiff in error submits that, in order to maintain this suit, it is necessary to show that it knew of the existence of a trade-mark, that it intended to palm off its goods as those of the Russia Cement Company, and that the public was deceived thereby. This might be true, if the only case shown by the proofs was that of an actual purpose to mislead the public, to the injury of the Russia Cement Company; but, as we place the case on the proposition that, under the circumstances, the use of the words "Manufactured by The LePage Company," in connection

with the word "glue," is necessarily a wrongful injury to the Russia Cement Company, which ought to have been foreseen by LePage and The LePage Company, we have not deemed it necessary to go into the controverted question of actual fraudulent intent or artifice, or to weigh the evidence on that point. Positive proof of fraudulent intent is not required where the proof of infringement is clear, as the liability of the infringer arises from the fact that he is enabled to sell a simulated article as and for the one which is genuine. *McLean* v. *Fleming*, 96 U. S. 245, 253; *Johnston* v. *Orr Ewing*, 7 App. Cas. 219, 232; Browne on Trade-Marks, (2d Ed.) § 508.

The record shows that, subsequently to the state of facts shown in *Cement Co.* v. *LePage*, 147 Mass. 206, 17 N. E. Rep. 304, a corporation was formed in January, 1887, being the defendant below, taking first the name of LePage's Liquid Glue & Cement Company. The original corporators were William N. LePage, his wife, and his counsel. The stock was taken by Mrs. LePage, except one share by her husband, and four by the counsel. October 20, 1886, LePage took out a patent for an alleged improvement in the process of making fish glue, which was transferred to The LePage Company on its organization; and also, at the same time, there were transferred to the same corporation the business and plant nominally of Mrs. LePage, in whose name was commenced the manufacture and sale of fish glues in the summer of 1886, soon after LePage sold out his interest in the Russia Cement Company. From the time of its organization The LePage Company carried on, among other things, the business of manufacturing and selling fish glues, claiming to use LePage's patented process; and he (William N. LePage) continued at all times to be an officer in the corporation, and active in its management, and his wife to be the principal stockholder.

It is not apparently maintained with positiveness that The LePage Company stands any better in this case than would have stood William N. LePage himself. Aside from the fact, which a jury might well find from the proofs in this case, that The LePage Company and the use of his wife's name were a mere cover for William N. LePage, and as to which we, of course, do not decide, it is certain that, under the circumstances, the court might well instruct the jury peremptorily that The LePage Company, by accepting the assignment of the patent from LePage, and by permitting him to control its business, has barred itself from denying that it is proceeding under his authority and as his successor. Therefore it can have no greater rights than LePage himself, and, so far as this case is concerned, stands exactly in his shoes.

Although the following citations relate to questions less broad than those at bar, yet they state very forcibly some of the underlying principles. In *Seixo* v. *Provezende*, L. R. 1 Ch. App. 192, 196, the lord chancellor, Lord CRANWORTH, said:

"I do not consider the actual physical resemblance of the two marks to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause

his goods to bear the same name in the market may be as much a violation of the rights of that rival as the actual copy of his device."

A leading case in England is that which commences as *Orr Ewing & Co.* v. *Johnston & Co.*, 13 Ch. Div. 434, and closes with *Johnston* v. *Orr Ewing, ubi supra.*

In the court of appeal numerous opinions were read, which were summarized in the reporter's notes as follows:

"If the goods of a trader have acquired in the market a name derived from a part of the trade-mark which he affixes to them, a rival trader is not entitled to use a ticket which is likely to lead to the application of the same name to his goods, even though that name is not the only name by which the goods of the first trader have been known, or though it has been always used in conjunction with some other words."

This was substantially affirmed in the house of lords, where the lord chancellor, Lord SELBORNE, said, (pages 225, 226:)

"But, although the mere appearance of these two tickets could not lead any one to mistake one of them for the other, it might easily happen that they might both be taken by natives of Aden or of India, unable to read and understand the English language, as equally symbolical of the plaintiffs' goods. To such persons, or at least to many of them, even if they took notice of the differences between the two labels, it might probably appear that these were only differences of ornamentation, posture, and other accessories, leaving the distinctive and characteristic symbol substantially unchanged."

Lord WATSON said, (pages 231, 232:)

"The reproduction of a prominent part of another merchant's trade-mark upon a new ticket does not *per se* establish that the latter was prepared by its owner with a view to deceive, by himself selling, or by enabling others to sell, his goods as the manufacture of that other merchant. But no man, however honest his personal intentions, has a right to adopt and use so much of his rival's established trade-mark as will enable any dishonest trader, into whose hands his own goods may come, to sell them as the goods of his rival."

The plaintiff in error claims that the letter from the attorney of the Russia Cement Company, of October 31, 1888, is an estoppel, or, at least, should have some weight on the question of damages;[1] but it shows only a desire to avoid unnecessary litigation, and, so far from waiving any rights, insists upon them. Apparently counsel wrote under an expectation of results as to which they have been disappointed; but, however that may be, the letter was given for no consideration, it cannot be shown that The LePage Company was misled by it, and it certainly contained a caution. It is possible that such a letter, coupled with evidence of laches, might have some effect on an accounting in equity; but in a suit at law it has none whatever. In *Chemical Co.* v.

---

[1] The letter is as follows: "MY DEAR SIR: The Russia Cement Company are not disposed to file a new bill against your client's use of the name 'LePage Company,' as long as they keep themselves strictly within their present lines. I have advised the Russia Company that the use of that name is a violation of their rights as heretofore defined by the decisions of the court, but they think that, in view of those decisions and the publicity which has been given to them, the use of their name, in the present manner, is not likely to do them harm enough in the long run to make it worth while to bring another suit."

*Meyer, ubi supra,* a very compromising letter was held not to operate as an estoppel.

We deem it necessary to consider only one of the exceptions as to the rule of damages, because our conclusion with reference to that supersedes all the others. The declaration alleges as follows: "Since the 1st day of November, 1888, knowingly, willfully, and fraudulently offered for sale, and is now selling, glue in packages," etc. There is no *continuando* with reference to the matter of selling; so that, according to the common law, the plaintiff below could properly prove only one actual sale as an independent basis of damages. The defendant insisted at all necessary points on the enforcement of this rule, and exceptions were carefully taken and allowed; so that this court, however much it may regret it, is compelled to meet this issue. There is no doubt that at common law the position of the defendant would be correct on this point, and the Massachusetts statutes relating to pleading have not changed this rule. Walk. Pat. (2d Ed.) § 435; *Eastman* v. *Bodfish*, 1 Story, 530; *Kendall* v. *Brick Co.*, 125 Mass. 532. In the face of this objection, the plaintiff proved at the trial, by the defendant's treasurer, sales of infringing goods, between November 1, 1888, and November 30, 1889, amounting to $56,318.24. It cannot be doubted that this was a substantial element in determining the verdict.

This relieves us from considering whether or not, in view of the fact that the plaintiff below persisted in proving transactions in various parts of the United States, he can now claim that his suit was based on any portion of the statute of Massachusetts which goes beyond the common law, if there be such, or whether at common law the allegation in the declaration that defendant "offered for sale," which was accompanied with a proper *continuando*, would form an independent basis for damages, or whether either the statutes of Massachusetts or those of the United States, relating to this topic, recognize a rule that any use of an infringing trade-mark short of actual sales can be made the basis of a suit at law. Judgment reversed, with costs, and case remanded to the circuit court, with directions to enter judgment for the plaintiff below for nominal damages and costs of that court, if plaintiff below so elects; otherwise to set aside the verdict, and take further proceedings not inconsistent with the opinion of this court.

