**MADRIGAL AUDIO LABORATORIES, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**CELLO, LTD., and Mark Levinson, Defendants-Appellants, Cross-Appellees.**

Nos. 1362, 1404,
Dockets 86–7224, 86–7254.

United States Court of Appeals,
Second Circuit.

Argued May 12, 1986.
Decided Aug. 20, 1986.

Christine S. Vertefeuille, New Haven, Conn. (Susman & Duffy, P.C., New Haven, Conn., of counsel), for Cello, Ltd.

David L. Belt, New Haven, Conn. (Alice S. Miskimin, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, Conn., of counsel), for Mark Levinson.

Edward A. Zelinsky, New Haven, Conn., for Madrigal Audio Laboratories, Inc.

Before MANSFIELD, CARDAMONE and WINTER,* Circuit Judges.

MANSFIELD, Circuit Judge:

Mark Levinson ("Levinson"), a well-known designer of audio-equipment, and Cello, Ltd. ("Cello"), a company founded and partially managed by him, which produces audio equipment designed by him, appeal an order of the District of Connecticut, Warren W. Eginton, *Judge*, enjoining Cello and Levinson from, among other things, publicizing the fact that Levinson works for Cello. Plaintiff, Madrigal Audio Laboratories, Inc. ("Madrigal"), purchased the Levinson trade name and trademark from Mark Levinson Audio Systems, Inc. ("MLAS"), a company Levinson had founded in the early 1970's to produce audio equipment and which was forced into bankruptcy in late 1984.

In this action by Madrigal for trademark infringement and unfair competition Judge Eginton in May 1985 enjoined Cello and Levinson from using the Levinson name and mark ("the 1985 injunction"). Neither Cello nor Levinson appealed from that or-

der. In February, 1986, however, Judge Eginton issued a second preliminary injunction ("the 1986 injunction") (1) barring Levinson and Cello "from generating any publicity" regarding Levinson's relationship with Cello or past relationship with MLAS, (2) enjoining Levinson from communicating with dealers or customers on Cello's behalf, and (3) ordering Cello to inform all persons who had received Cello publicity brochures advertising Levinson's designing of products for Cello that Madrigal owned the Levinson trade name and trademark. We reverse the district court's order and dismiss Madrigal's cross-appeal.

## BACKGROUND

In 1971 Mark Levinson founded MLAS to produce "high-end" audio equipment to his design. In the audio industry "high-end" products are expensive and relatively sophisticated. Levinson incorporated MLAS in 1976. Though Levinson's designs were of high quality, by 1980 MLAS was in serious financial trouble. Levinson then asked Sanford Berlin, a retired executive in the audio industry, to invest in MLAS and to aid in the management of the company, which Berlin did, personally investing $480,000 in the company and persuading several others to invest an additional $300,-000.

At Berlin's request, Levinson entered into an "Employment Agreement" with MLAS in December 1980, under which Levinson agreed to work exclusively for MLAS as an advisor to management and as a developer of audio equipment in exchange for an annual salary of $15,000. He also agreed that, should he leave MLAS' employ, he would not engage in the audio business "anywhere in the world" until December 31, 1988. Finally, the Agreement stated that if Levinson "cease[d] to be employed by [MLAS]" he would "not thereafter use or permit the use of the name 'Mark Levinson,' 'Mark Levinson Audio,' or any other name including 'Mark Levinson'

---

* Judge Ralph K. Winter recused himself from participating in hearing the argument and deciding this appeal. Pursuant to this court's Rule § 0.14 the appeal has accordingly been heard and decided by the remaining two judges of the panel, who constitute a quorum.

in the name or trademark of any corporation" engaged in a business similar to that of MLAS.

Less than two years later, in March 1982, Levinson entered into a second agreement with MLAS. In it MLAS agreed to increase his salary to $25,600 per year "effective as of July 1, 1982" and $38,600 per year "effective as of January 1, 1984." In return, Levinson agreed to continue to work exclusively for MLAS, to convey "to MLAS the permanent and exclusive right, title and interest to the trade name 'Mark Levinson', and all variations thereof, in connection with the sale [and] distribution" of audio equipment and not to use or permit the use of the Levinson trade name, other than by MLAS, in connection with the audio business. The parties defined use of the Levinson trade name as "use of such trade name, or variation thereof, (a) as part of the name of a corporation, partnership, joint venture, proprietorship, firm or business or (b) as the name, symbol or identification of any product." Under Berlin's management, MLAS produced a series of audio products under the "Mark Levinson" label.

Despite the 1982 agreement, Levinson's relationship with MLAS' new management deteriorated. In early 1983 Berlin placed Levinson's salary in escrow. In the summer of 1984 Levinson left MLAS and founded another company to produce audio equipment, defendant Cello, Ltd. Levinson became president and was one of the three directors of Cello. His father and stepmother were the other two directors, and his father owned 75% of Cello's shares. MLAS never claimed that Levinson's conduct violated his agreement not to compete against it in the audio business.

In October, 1984, three creditors forced MLAS into bankruptcy. Shortly afterwards, Berlin founded Madrigal. MLAS' assets were auctioned on January 31, 1985. The "Notice of Sale of Debtor's Property at Public Auction" listed "the trade name, Mark Levinson Audio Systems, Ltd.", among the assets to be auctioned. There was no mention of Levinson's employment contract with MLAS or of its non-competition terms. Madrigal, bidding against Cello, acquired, in the words of the bankruptcy trustee's bill of sale, "all of [MLAS'] equipment, inventory, parts, finished and semi-finished goods, office furniture, blueprints and trademark and tradename rights inculding [sic] those arising under agreement dated December 30, 1980 and March 4, 1982 between Mark Levinson ... and [MLAS]" for $150,000. Once again, there was no mention of Levinson's agreement not to compete against MLAS.

Cello began marketing its first product, the "audio palette", in February, 1985. The palette sells for $9,000 and is similar to an equalizer. It is designed to restore tonal balance to a recording by overcoming distortions which may be caused by the recording itself, the listening room or the equipment used to play the recording. Cello attached a silver label to each audio palette stating "Cello by Mark Levinson" and issued a promotional brochure entitled "Cello by Mark Levinson". The brochure began with a one page "Note from Mark Levinson" and contained several photographs of Levinson.

Madrigal opened for business shortly after Cello's product hit the market. It produced the same products MLAS had made and marketed them as the "Mark Levinson" line.

On May 15, 1985 Madrigal brought suit in Connecticut state court accusing Cello and Levinson of trademark and trade name infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125, common law unfair competition, and violation of Connecticut's Unfair Trade Practices Act, Conn.Gen.Stats. §§ 35–1, 35–11i(c). Levinson and Cello removed the case to the United States District Court for the District of Connecticut. In the proceedings that followed, Madrigal did not press its common law or Connecticut state law claims and they did not figure in the district court's decision. They, accordingly, play no part in this appeal.

On May 29, 1985 Judge Eginton appointed F. Eugene Davis IV as Special

Master to hear testimony on Madrigal's claims, stating:

"I don't understand anything about the merits of any patent or trademark case. I'm not about to educate myself in that jungle. I appoint routinely Special Masters who know what this is all about ... I would have no confidence in my ability to do any justice in that thicket of patent and trademark, which I never understood when I was trying to practice law, and I wouldn't begin to understand it now.

\* \* \* \* \* \*

" ... So this Court's jurisdiction is invoked strictly on the Federal Trademark Act, and that means that it's got to be trademark issues that this Court would consider, and I'm not about to consider those.

"So we're going to get it into the hands of a Special Master who hopefully will be able to hear you this week so that some proper order can be issued.

\* \* \* \* \* \*

" ... [Y]ou're not going to get any expertise from me in [the] field [of trademark law]." [1]

Cello, Madrigal and Levinson did not object to Judge Eginton's appointment of the Special Master.

Special Master Davis heard testimony on Madrigal's claim on May 30 and 31. After hearing evidence of Cello's use of the "Cello by Mark Levinson" brochure and the "Cello by Mark Levinson" label on the audio palette, Davis reported to Judge Eginton on the afternoon of May 31. He found that "there is a likelihood of confusion, mistake and deception in the trade by the simultaneous use of Mark Levinson by the two companies; and that, therefore, the use of the defendant is an infringement of

the plaintiff's rights". Judge Eginton accepted the Special Master's factual findings and enjoined (i) Cello from using the promotional brochures linking Levinson to Cello; (ii) Cello and Levinson from using the Levinson trademark or trade name, and (iii) Levinson from "attending the International Summer Consumer Electronic Show in Chicago Il." Neither Cello nor Levinson appealed from this order.

Madrigal, dissatisfied with the injunction, on July 15 requested that it be modified (1) to bar Cello and Levinson from using the name " 'Mark Levinson' ... in connection with any product manufactured or distributed by Cello" or from "issuing press releases or advertising or generating any publicity, oral or written" concerning Levinson's connection with Cello and (2) to require Cello to mail a letter to all recipients of Cello's publicity brochures indicating that Madrigal owned the Levinson trade name. In August, Madrigal filed a motion accusing Cello and Levinson of contempt for allegedly violating the May injunction. The present record does not reveal what became of the contempt motion, and the matter is not at issue on this appeal.

The Special Master held hearings on Madrigal's motions on September 24 and October 2, 1985. Berlin, one other Madrigal executive, and several dealers in audio equipment testified on Madrigal's behalf. Levinson and personnel from Cello testified for Cello. All the witnesses agreed on several points. First, after the May 1985 injunction, Cello had removed the "Cello by Mark Levinson" plate from its products and discontinued use of the enjoined brochures.

---

1. We must express our firm disagreement with the district judge's concept of his duties. Having by his oath of office accepted the task of adjudicating all issues falling within the court's federal jurisdiction, he is obligated, whenever faced with unfamiliar factual or legal issues (including those involving trademark and copyright matters), to educate himself in those fields with the aid of counsel, colleagues on the bench, law clerks, and published texts and decisions. This has been the path traditionally followed by respected members of the federal judiciary. See, e.g., Medina, "A New Judge Tries His First Patent Case," 34 Cornell L.Q. 220 (1949); Rifkind, "The Romance Discoverable in Patent Cases," 16 F.R.D. 253. Resort to a Special Master is permissible only when "some exceptional condition requires it." Fed.R.Civ.P. 53(b). No such circumstance or condition existed here.

Second, the dealers testified, and Levinson agreed, that after the May injunction he had helped in the marketing of Cello's audio palette. He testified that he had personally contacted dealers who sold "high end" audio equipment to encourage them to carry Cello products. He also admitted that he spoke to journalists for two American audio magazines. *Audio* and *The Absolute Sound*, and one British journal, the *Hi-Fi News*, that he had attended a trade show in England and that he had given a "seminar" on Cello for one dealer.

Third, Berlin and the two dealers, both of whom were called by Madrigal, testified that Madrigal and Cello produced different products. Madrigal was not marketing an "audio palette" or an equalizer. Furthermore, they agreed that the products looked very different and that, since Cello had removed the "Cello by Mark Levinson" label from the audio palette after the May injunction, there was little chance that a consumer would think that the products sold by Madrigal and Cello, respectively, were produced by or came from the same source. Both dealers testified that they had explained to their customers that Madrigal owned the Mark Levinson trade name but that Levinson himself was designing products for Cello. Madrigal introduced no evidence that customers purchased, or were in danger of purchasing, Cello products in the belief that they had been produced by Madrigal, or vice versa.

Berlin, Mark Glazier (the President of Madrigal) and the dealers did testify, however, that Levinson's connection with Cello might cause "confusion" in the high-end audio market. It was apparent that they were referring to confusion among dealers as to Levinson's legal right to help Cello produce and sell audio equipment. Both dealers explained that the "confusion" they feared would arise if a competing dealer began carrying Cello products and marketing them as the "real" Mark Levinson line. Both admitted, however, that since they were the only dealers carrying both Cello and Madrigal for their respective areas no such problem had arisen. Madrigal introduced no evidence that any Cello dealers were using the marketing ploy feared by the dealers.

Though there was virtually no evidence that any one was "confused" as to which company Levinson worked for, or which company produced which product, there was overwhelming evidence that Levinson had a very substantial personal reputation among consumers of high-end audio products as a designer of audio equipment. Robert Goddard, one of the dealers Madrigal called as a witness, explained that he wanted to carry both Cello and Madrigal products because of Levinson's reputation in the marketplace. He explained:

> "The high end audio market is driven enormously by personality. It's true at the manufacturing and design level in terms of high end audio products.... [N]ot a lot of people care who runs Sony, for example, but many people care who runs Mark Levinson, who runs Audio Research, that sort of thing. If Mr. Johnson, for example, were to leave Audio Research, there would be an enormous concern with what he was going to do next. And it would be very questionable whether Audio Research would continue and be significant. And its [sic] important on the sales floor, day in and day out, in terms of the way these products are presented, and I think important in the customers' minds."

A second dealer called by Madrigal, Peter McGrath, made the same point. He explained that if it became known that Levinson was designing Cello's products, not Madrigal's, he would be concerned that he "would, in fact, have products that bear [Levinson's] name and not his involvement, and that my competitor has products which don't bear his name but his involvement." Any customer buying products of the quality produced by Madrigal or Cello, McGrath continued, would "place great value" on Levinson's involvement, not on the fact that a product bore his name.

Evidence of Levinson's very substantial personal reputation in the high end audio market was not limited to the testimony of

the dealers. Madrigal's chief investor, Berlin, admitted that news that Levinson was designing products for Cello, not for Madrigal, "would destroy [Madrigal's] distribution in the United Kingdom or virtually destroy it." An English trade show even advertised itself with the words: "Groupies take notice. Mark Levinson will be at the [show]."

On October 7, Madrigal filed an "Amended Motion to Modify and Clarify the Injunction" and a brief responding to the "Objections of Mark Levinson." The new motion sought an injunction barring Levinson from "communicating" in any way with dealers, customers or journalists in the high end audio industry and ordering "Mark Levinson, every Tuesday, to file with the court a notarized statement confirming his compliance with the foregoing." Madrigal also asserted that it had purchased Levinson's agreement not to compete from MLAS at the bankruptcy auction. Only in the course of argument did it contend that the Levinson case was similar to a Second Circuit decision, *Levitt Corp. v. Levitt,* 593 F.2d 463 (1979), in which sweeping injunctive relief had been granted against an individual who attempted to use his personal name in connection with his business after selling the right to use the name as a trademark or trade name.

On December 30, 1985, the Special Master submitted a written report to Judge Eginton on the motion to modify the preliminary injunction. The report asserted that there was confusion among ultimate consumers of audio products as to whether Madrigal's or Cello's products "emanate from Mark Levinson" and that Cello was "literally doing business as Mark Levinson's company." The Special Master, relying heavily on our decision in *Levitt, supra,* therefore concluded that Cello and Levinson's conduct violated Madrigal's right to the Levinson trade name and trademark and recommended that Levinson and Cello be barred from publicizing Levinson's connection with Cello.

Judge Eginton accepted the Special Master's recommendations on February 24, 1986 and modified the May injunction accordingly. As modified the injunction (i) barred Cello and Levinson "until further order of the court, from generating any publicity, oral or written, from issuing any press releases or advertising, and from communicating in any manner with any dealer or distributor of audio or hi-fidelity equipment, throughout the world, about the defendant Mark Levinson's connection with Cello, Ltd." or past connection with MLAS; (ii) barred Levinson from serving as Cello's sales representative; and (iii) ordered Cello to notify all who had received its promotional brochures mentioning Mark Levinson that those brochures infringed Madrigal's right to the Levinson trademark and trade name.

Cello and Levinson appeal from the district court's order as a violation of their rights. Madrigal cross-appeals from the order as insufficient.

## DISCUSSION

Madrigal's Cross-Appeal: Should the District Court have Enjoined Levinson from Violating the Agreement Not to Compete?

Madrigal's argument that Judge Eginton should have enjoined Levinson from violating the agreement not to compete which Madrigal claims to have with Levinson merits little attention. Madrigal never requested any such injunction in the lower court. Its mere reference to the agreement in its brief submitted to the Special Master on October 7, 1985, hardly constituted a motion to enforce the agreement not to compete. It simply mentioned the agreement in an effort to analogize Levinson's conduct to that enjoined by this court in *Levitt, supra.* It did not ask that the agreement not to compete be enforced.

■ A party "may not raise claims on appeal which it failed to raise before the trial court" unless "manifest injustice" will result. *Schmidt v. Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984). *See also Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 493 (2d Cir.1985); *Terkildsen v. Wa-*

*ters,* 481 F.2d 201, 204 (2d Cir.1973). Madrigal's cross-appeal implicates "factual questions ... as to which the judge made no findings because the issue was not directly raised". It further raises a "subtle legal issue" which "could have been exposed and distilled by the ... district court so as to facilitate ... consideration of this court." *Id.* at 204–05. It must therefore be dismissed.

The factual question raised by the cross-appeal is whether Madrigal has any right to enforce Levinson's agreement with MLAS not to compete against MLAS. That agreement is not among the properties listed in the Bankruptcy Trustee's "Notice of Sale of Debtor's Property" or in the "Bill of Sale". Nor is there any evidence that Madrigal purchased the agreement not to compete against MLAS. Indeed, there is some evidence that the agreement was not among the assets auctioned off. Madrigal's delay in raising the enforceability of the agreement not to compete, when it was aware of the agreement's existence, suggests that its present belated claim is a weak one at best.

Furthermore, it is uncertain whether the agreement with MLAS would be legally enforceable by Madrigal. It is true that Connecticut adheres to the view, rejected in most jurisdictions, *see* 2 Callmann, *Unfair Competition, Trademarks & Monopolies,* § 16.15 at 62 (4th ed. 1983, 1986 Supp.); Comment, "Assignability of Employees' Covenants Not to Compete," 19 U.Chi.L.R. 97, 106 (1951), that an employee's covenant not to compete is an assignable asset of the employer, *Torrington Creamery Inc. v. Davenport,* 126 Conn. 515, 12 A.2d 780, 783 (1940). However, that state also requires that the agreement "be partial or restrictive in its operation in respect either to time or place, be on some good considera-

tion and ... be reasonable—that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public." *Id.,* 12 A.2d at 783. *See also Scott v. General Iron & Welding Co.,* 171 Conn. 132, 368 A.2d 111, 115 (1976); *Mattis v. Lally,* 138 Conn. 51, 52, 82 A.2d 155 (1951); *Timenterial Inc. v. Dagata,* 29 Conn.Sup. 180, 277 A.2d 512, 513 (1971); *Welles v. O'Connell,* 23 Conn.Sup. 335, 183 A.2d 287, 288 (1962). Upon the present record Levinson could argue, with some force, that the agreement not to compete, because of its worldwide reach and the minimal consideration Levinson received for it, fails to satisfy those requirements.

*The Appeal by Cello and Levinson*

Initially, Cello and Levinson claim that the injunction is void because the case was improperly submitted to a Special Master. However, neither party made that argument before the district court, either before or after the submission of the case to the Special Master, and they therefore may not raise it for the first time here. *Hayes v. Foodmaker, Inc.,* 634 F.2d 802, 803 (5th Cir.1981); *Cruz v. Hauck,* 515 F.2d 322, 330–31 (5th Cir.1975).[2]

The determinative issue on the appeal of Cello and Levinson is whether an individual who sold the right to use his personal name as a trade name may be enjoined from advertising the fact that he is now connected with a company competing against the purchaser of the trade name. On this issue Madrigal, in seeking a preliminary injunction, assumed "the burden of showing irreparable harm *and* (1) either probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *plus* a

---

**2.** Had Cello and Levinson made a timely objection, Judge Eginton's decision to submit the case to a Special Master might well have called for a reversal on the ground that he had exceeded his powers. See footnote 1, *supra.* The present case would not satisfy the requirement that "exceptional circumstances" permitting such reference first be found. *Bradshaw v. Thompson,* 454 F.2d 75, 80 (6th Cir.), *cert. denied,* 409 U.S.

878 (1972); *Wilver v. Fisher,* 387 F.2d 66, 69 (10th Cir.1967). "[T]he fact that 'the case involves complex issues of fact and law is no justification for reference to a Master, but rather is a [com]pelling reason for trial before an experienced judge.'" *Moore, supra,* 454 F.2d at 80 (quoting *Bartlett-Collins Co. v. Surinam Nav. Co.,* 381 F.2d 546, 551 (10th Cir.1967).

balance of hardships tipping decidedly in the plaintiff's favor." *Texaco, Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1152 (2d Cir.), *prob. juris. noted,* —— U.S. ——, 106 S.Ct. 3270, 91 L.Ed.2d 561 (1986). *See also Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 54 (2d Cir.1985).

■ The district court apparently issued the 1986 injunction on the theory that the conduct of Cello and Madrigal impinged upon Madrigal's interest in *both* the "Mark Levinson" trademark and trade name. The injunction cannot, however, be justified as protection for Madrigal's interest in the Levinson *trademark,* which is a word, name, symbol or device "adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 11 U.S.C. § 1127. *See also* 3 Callmann, *supra,* § 17.05. A preliminary injunction barring a party from using a mark or symbol similar to a registered trademark may be issued only when "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62, 66 (2d Cir.1985) (quoting *McGregor-Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979) ); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1970). Such a showing satisfies a trademark holder's burden, when seeking a preliminary injunction, of establishing both likelihood that he will succeed on the merits and that he will suffer irreparable harm if an injunction is not granted. *Standard & Poor's Corp. Inc. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982); *Vision, Inc. v. Parks,* 610 F.Supp. 927, 929 (S.D.N.Y.1985). *See also Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 at n. 1 (2d Cir.1978).

■ No such showing was made here. Although Cello had used the phrase "by Mark Levinson" on its products and brochures prior to May 1985, there is *no* evidence that after the district court's May 31, 1985, injunction it applied any type of mark to its products that would lead a consumer to mistake the item for Madrigal's. To the contrary, all witnesses agreed that the equipment produced by each company was distinct. Indeed, Madrigal now explicitly concedes that the district court's later 1986 injunction cannot be justified as necessary to protect Madrigal's "Mark Levinson" trademark. It argues, however, that that injunction was necessary to protect Madrigal's right to the "Mark Levinson" *trade name.* We disagree.

■ Just as trademarks identify a product, trade names are "used by manufacturers ... and others to *identify their business* " 15 U.S.C. § 1127 (emphasis added). *See also* 3 Callmann, *supra* § 17.05. A name becomes a trade name and merits protection under § 43 of the Lanham Act, 15 U.S.C. § 1125, when it acquires a "secondary meaning", i.e., when the name comes to "symbolize a particular business ..." to consumers. *Dallas Cowboys, Etc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203 n. 5 (2d Cir.1979). *See also Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir.1981). An individual's personal name can acquire, through advertising or some other means, such a "secondary meaning"; thereupon it may become a trade name. *Levitt, supra,* 593 F.2d at 468; Mandell, "Personal Name Trademarks—Your Name May Not Be Your Own," 70 TMR 326 (1980); 3 Callmann, *supra,* at § 17.06. But even when a personal name has become a trade name it continues to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated. 3 Callmann, *supra,* at § 17.06. Accordingly, though an individual may sell the right to use his personal name, *Levitt, supra; Guth v. Guth Chocolate Co.,* 224 F. 932, 933–34 (4th Cir.1915); *The Lepage Co. v. Russia Cement Co.,* 51 F. 941, 943 (1st Cir.1892), a court will not bar him from using that name unless his "intention to convey an exclusive right to the use of [his] own name" is "clearly shown." *Guth Chocolate Co. v. Guth,* 215 F. 750, 767

(D.Md.1914), *aff'd, Guth, supra.* *See also* 3 Callmann, *supra,* § 19.60 at 236.

■ Whether a person who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale, *Id.* at § 19.60. *See also Duryea v. National Starch Manuf'g Co.,* 79 F. 651, 653 (1897), *aff'd,* 101 F. 117 (2d Cir.1900). When an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products, *Levitt, supra,* 593 F.2d at 468; *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 735 (2d Cir. 1978), and not from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name, 3 Callmann, *supra,* § 19.60 at 236; *see also Guth Chocolate Co., supra,* 215 F. at 767, 772; *The Lepage Co., supra,* 51 F. at 944–46, or from advertising, in a not overly intrusive manner, that he is affiliated with a new company. 3 Callmann, *supra,* § 19.60 at 236. *See also Guth Chocolate Co., supra,* 215 F. at 767; *Auto Hearse Mfg. Co. v. Bateman,* 109 A. 735, 736 (N.J. Ch. 1920).

■ In the present case, Levinson sold MLAS the right to "use" the Levinson trade name and defined "use" to be "use ... (a) as part of a name of a corporation, partnership, joint venture, proprietorship, firm or business or (b) as the name, symbol or identification of any product." By its terms, therefore, the sale of the trade name did not preclude Levinson from engaging in the audio business through a company other than Madrigal or from advertising his affiliation with such a company. In short, he did not sell or forfeit his right to use his own personal name as long as he did not use it as the trade name of another business.

■ Madrigal does not seriously contend that the sale of the trade name, in and of itself, bars Levinson from informing the public that he is now designing audio equipment for Cello.[3] Rather, it argues that the advertisement of Levinson's affiliation with Cello infringes on Madrigal's right to the Levinson trade name by presenting Cello to consumers as "the Mark Levinson Company" and the true successor to MLAS. It is true that an individual who sells a trade name may not thereafter falsely designate the origin of newly-produced products by using his name in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name. Such "false designation of origin" is impermissible. *Vibrant Sales, supra,* 652 F.2d at 303; *Levitt, supra,* 593 F.2d at 468; *Guth Chocolate Co., supra,* 215 F. at 762. Moreover, when accusing the trade name seller of this offense, the trade name purchaser need not "prove that the buying public was actually deceived ... only a likelihood of confusion or deception need be shown in order to obtain equitable relief." *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981) (cites omitted). *See also Dallas Cowboys, Etc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979).

The record here, however, fails to support a "false designation of origin" theory. On the contrary, there is no evidence that Cello and Levinson's conduct after the May, 1985 injunction was likely to confuse consumers as to the origin of Cello's products. All witnesses agreed that the products sold respectively by Madrigal and Cello did not appear to come from the same source. Each of the dealers who testified for Madrigal made it clear that Levinson, in

---

3. Madrigal suggests that Levinson's contract with MLAS incorporated an agreement not to compete. But, as we have noted, there is substantial doubt whether Madrigal, as the purchaser of various MLAS assets, has any right to that agreement and whether the agreement is enforceable if it does. In any event Madrigal did not argue below that it held any right to that agreement and the district court issued the injunction based solely on the Special Master's finding of trade name and trademark infringement. The crucial point, therefore, is that, when selling the right to use his name as a trade name, Levinson only sold the right to use "Levinson" in the name of a business or of a product.

his dealings with them, explained that Cello and Madrigal were different companies and that he worked for the former. The dealers also testified that they made the same point to their customers. None of Madrigal's witnesses testified that customers might be confused by Cello's conduct. The confusion to which they referred was over whether Levinson had the legal right to work for Cello or what might happen if a Cello dealer began marketing the audio-palette as part of the "real" Mark Levinson line. However, none of the witnesses suggested that any such dealer existed or that Cello had ever used such a marketing technique. Accordingly, the evidence was totally insufficient to "create a fair ground for litigation" over whether consumers were likely to mistake Cello for Madrigal.[4]

 The second theory relied upon by the Special Master, impermissible "arrogation of goodwill", see Levitt, supra, is likewise inapplicable to this case. It is, of course, an accepted principle that when a business purchases a trade name the essence of what it pays for is the goodwill associated with that trade name. Levitt, supra, 593 F.2d at 468. See generally, Greenfield, "Good Will as a Factor in Trademark Assignments—A Comparative Study," 60 TMR 173 (1970). To be protectible, the trade name must have acquired a "secondary meaning" which represents to consumers the past accomplishments, special experience, and particular skills of the business with which it is connected, Levitt, supra, 593 F.2d at 468, and therefore the "goodwill" which consumers have toward that business. See, e.g., Menendez v. Holt, 128 U.S. 514, 522, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888) (goodwill means "every positive advantage that has been acquired by the old firm in the progress of its business"); Levitt, supra, 593 F.2d at 468 (when busi-

ness purchases trademark it purchases right to inform public that it owns special skill of the business which originally held the trade name); Greenfield, "Good will as a Factor in Trademark Assignments—A Comparative Study," 60 TMR 173, 173–75 (1970) (Anglo-American courts define goodwill in terms of business reputation). Since it is the "secondary meaning" that is protected against infringement, the degree of protection afforded a trade name depends upon the "strength" of its secondary meaning. Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259 (5th Cir.), rehearing denied, 617 F.2d 295 (5th Cir.1980), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1981); J.B. Williams Co., Inc. v. Le Conte Cosmetics, Inc., 523 F.2d 187, 192 (9th Cir.1975); 3A Callmann, supra, at § 20.43; Lunsford, "Trademark Basics," 59 TMR 873, 878 (1969). Cf. Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62, 67 (2d Cir.1985) (scope of injunction in trademark infringement determined by trademark holders' property interest in mark).

 The value of a trade name, and therefore of the goodwill it represents, is diluted if another business, by adopting a name similar to the trade name, causes confusion "in the mind of the public over the source of the reputable goods or services." Levitt, supra, 593 F.2d at 468. Similarly, an individual may not "keep for himself the essential thing he sold, and also keep the price he got for it", id.; Guth v. Guth Chocolate Co., supra, 224 F. at 934, by selling the right to use his personal name as a trade name, then advertising his connection with another company in such a way as to arrogate "to himself the trade reputation for which he received valuable consideration," Levitt, supra, 593 F.2d at 468.

---

**4.** The paucity of evidence supporting Madrigal's "confusion" claim is illustrated by the fact that Madrigal, on appeal, repeatedly quotes a passage from an article which appeared in the small West-Coast audio magazine, High Performance. Madrigal claims that the article's statement, "Mark Levinson, the person, announced to us … that his Cello, Ltd. would produce … components in the Mark Levinson tradition", demonstrates that confusion existed.

Read as a whole, however, the article demonstrates the opposite. The sentence Madrigal relies on is the very last in the article, and appears in parentheses. The import of the article, and the point it made in its opening paragraph, is that Madrigal had purchased MLAS' assets, including the "Levinson" trademark, and was producing "Mark Levinson audio products" in MLAS' old factory.

Applying these fundamental principles here, it is clear that Madrigal at most acquired such goodwill as was associated with the use of the trade name "Levinson" by MLAS and not the right to use Levinson's personal name as a symbol of his individual reputation.[5] The record, moreover, reveals that the secondary meaning attached to the trade name was weak, that there was little business goodwill associated with its use by MLAS, who purchased it from Levinson for a token amount, and that it therefore merited little protection. The real value in the "Levinson" name lay in Mark Levinson's very substantial individual reputation. Madrigal's own witnesses admitted that the "high-end" audio business, especially companies such as MLAS, is "driven" by personality, that Madrigal's sales would plummet if the consumers knew Levinson was no longer designing its products and that consumers looked for Levinson's "involvement" with a product rather than for his name on its label.

Nor is there any evidence that after the 1985 injunction Levinson arrogated to himself the value of the goodwill sold to Madrigal. Madrigal's dealers testified that Levinson's sales pitch to them and their customers focused on the quality of the audio palette and on Levinson's own individual reputation. There was virtually no evidence that Levinson was attempting to boost Cello's sales or increase his own reputation by reference to his past ties to MLAS. Levinson did admit that he told a "seminar" of customers that he had been associated with MLAS. There was no evidence, however, that he went beyond that simple factual statement or in any way attributed MLAS' past success to his own activities. Madrigal also introduced an article from the small audio magazine, *High Performance,* which closed with the statement that Levinson had said that "Cello

Ltd. would produce [audio-equipment] in the Mark Levinson tradition." Though Levinson's comment, if quoted correctly, could arguably have been improper, it, in isolation, is not evidence enough to suggest that Levinson must be enjoined from "keeping for himself" the goodwill he sold with the Levinson trade name.

Madrigal has failed to "raise a fair ground for litigation" on its claim that the conduct of Levinson and Cello after the May 31, 1985 injunction violated Madrigal's trade name and trademark rights and must, therefore, be enjoined. Accordingly, we reverse in their entirety the February 1986 modifications to the 1985 injunction.[6]

---

**5.** Indeed, it is unclear that Levinson could have sold his personal name after becoming associated with Cello. Levinson held a reputation for skill as a designer of audio products. Madrigal might commit a fraud of sorts on the public if it represented itself as possessing Levinson's personal skill when that skill was, in fact, dedicated to Cello. 3 Callmann, *supra,* at § 19.60.

**6.** Since we find that the injunction was wholly unsupported by the record, we need not reach Cello's claim that the injunction violated the First Amendment.